OPINION OF THE COURT
Richard F. Braun, J.
In this class action for a declaratory judgment, this court presided over a 35-day nonjury trial of some of the claims in this action. A second phase of trial is to follow after the first one is decided. By order and stipulation, this court certified a class consisting of over 20,000 individuals who had asbestos-related personal injuries and had actions pending against defendant Robert A. Keasbey Company, most of which were in Supreme Court, New York County.
Defendant Keasbey has defaulted in this action. Although plaintiffs Continental Casualty Company and American Casualty Company of Reading, Pennsylvania did not take proceedings before trial to seek entry of a default judgment against defendant Keasbey within a year of said defendant’s default, plaintiffs pursued their claims against defendant Keasbey in all pretrial proceedings and at trial. Thus, the court will not exercise its power under CPLR 3215 (c) to dismiss the complaint as abandoned as to defendant Keasbey.
The class defendants asserted counterclaims and cross claims. This court granted plaintiffs’ motion to dismiss the class defendants’ first and second counterclaims, pursuant to CPLR 3211 (a) (7). That order was affirmed by the Appellate Division (Continental Cas. Co. v Nationwide Indem. Co., 16 AD3d 353 [1st Dept 2005]). By two stipulations thereafter, the parties agreed to this court’s dismissing the class defendants’ remain *226 ing counterclaims and cross claims, and thus they were dismissed.
Defendant Employers Liability Assurance Company, now known as One Beacon America Insurance Company, in its answer’s wherefore clause asserted requests for declaratory relief, though no cross claim or counterclaim was denominated therein. Plaintiffs and the class defendants objected to this court’s awarding any relief at this time to defendant One Beacon. However, defendant One Beacon did raise its claims (see CPLR 3011, which only requires a reply to a counterclaim that has been denominated as such, with the obvious implication being that one can have a counterclaim without calling it such), presented evidence regarding the claims, and summed up thereon. Even if defendant One Beacon had not demanded in its answer the relief sought, the court could still award relief to said defendant based on its proof at trial (CPLR 3017 [a]). Contrary to plaintiffs’ argument, the final pretrial order of this court did not sever defendant One Beacon’s claims for the second phase of trial to follow this one, but rather specified, as proposed by the parties, that only two interinsurance company causes of action by plaintiffs (the sixth and seventh) would be severed for that phase, and stated that “the other issues in this action” would be heard in the first phase of the trial. Thus, the court ruled that it should decide the claims of defendant One Beacon now. However, to be fair to the objecting parties, who contended that they were being sandbagged by defendant One Beacon, the court reopened the record as to defendant One Beacon’s claims (see CPLR 3017 [a]).[1]
The parties submitted to this court almost 1,600 pages of proposed findings of fact and conclusions of law, including, at this court’s suggestion, oppositional statements thereto. To the extent that the parties agreed with or did not oppose the others’ proposals, at the further suggestion of the court the parties stipulated that the court could incorporate by reference into the court’s findings of fact and conclusions of law the agreed to and/or unopposed proposed findings and conclusions, which are hereby so incorporated. Furthermore, the court is stating herein, pursuant to CPLR 4213 (b), those findings that it deems essential.
*227 Plaintiffs are seeking in this action the interpretation of certain insurance policies that they issued to defendant Keasbey. Defendant Keasbey was a corporation that ceased doing business in about 1995 and was dissolved in 2001 for nonpayment of taxes. The subject policies issued by plaintiffs to defendant Keasbey are 17 primary general liability policies with policy periods from 1970 through 1987 and excess policies with policy periods from 1971 through 1978. Products hazard/completed operations aggregate limits of liability for the primary policies ranged from $300,000 to $1,000,000, with combined aggregate limits of $8,700,000. Defendant One Beacon issued two wrap-up insurance policies covering Indian Point Units 2 and 3 for periods from 1966 through 1974 and 1967 through 1977 respectively.
Plaintiffs defended defendant Keasbey in asbestos-related personal injury actions and paid for its settlements. By May 1992, plaintiffs had paid out the combined aggregate limits of $8,700,000. Defendant Employers Insurance Company of Wausau paid out the aggregate limits of the products hazard coverage of that defendant’s two primary policies. Thus, the primary policy aggregates of plaintiffs and that defendant were exhausted. Between May 1992 and May 2001, the excess insurance carriers, including plaintiffs, paid out over $100,000,000 under their policies.
The attorneys for the majority of the asbestos-injured claimants sent a letter, dated May 15, 2001, to defendant Keasbey’s litigation counsel asserting that the products hazard/ completed operations aggregate limits did not apply to the so-called nonproducts claims involved in the underlying asbestos action, because most of the claims in the actions related to exposure during defendant Keasbey’s asbestos installation activities. The claimants’ attorneys argued that these claims fall under the premises/operations coverage of the primary and excess policies. The attorneys contended that as a result the actual value of defendant Keasbey’s insurance coverages was vastly greater than the aggregate policy limits and could even be perpetual. Although aggregate limits for the premises/ operations coverage could have been provided for in the policies, no aggregate limits were included. The only limitation for such coverage was the per occurrence provision in each policy. It is estimated by plaintiffs that approximately $100,000,000 to $250,000,000 is at issue in this action (or possibly even more) and that it is costing plaintiffs about $600,000 to $1,000,000 per *228 month to defend defendant Keasbey in pending asbestos personal injury actions.
Prematurity
The class defendants argue that plaintiffs are premature in bringing this action. The Appellate Division did hold in affirming this court’s dismissal of counterclaims in this action (16 AD3d at 355) that the class defendants acted prematurely in interposing their counterclaims against plaintiffs prior to obtaining judgments against defendant Keasbey that remained unsatisfied for 30 days after serving notice of entry of the judgments on plaintiffs and on defendant Keasbey or its attorney, pursuant to Insurance Law § 3420 (a) (2) (see Lang v Hanover Ins. Co., 3 NY3d 350, 354 [2004]). However, plaintiffs stand in a different position than the class defendants who have to rely upon that statute for standing to sue (id.). Thus, plaintiffs had the right to bring this declaratory judgment action and were well advised to do so (id. at 356).
Plaintiffs — Products Hazard/Completed Operations Coverage versus Premises/Operations Coverage
Plaintiffs’ first cause of action is for a judgment declaring that the pending asbestos actions fall within the “Products Aggregates” of the subject insurance policies for products hazard and completed operations coverage, or declaring which of the actions fall in whole or in part within those aggregates; and that any asbestos action involving products sold and relinquished prior to February 15, 1970 or operations completed prior to February 15, 1970 falls within the products aggregates. As the parties requesting a declaratory judgment, generally plaintiffs have the burden of proof to show that they are entitled to such relief (see Nicosia v Shultis, 239 AD2d 473 [2d Dept 1997]; Mount Vernon Fire Ins. Co. v NIBA Constr., 195 AD2d 425, 427 [1st Dept 1993, Sullivan, J., concurring]; Levy v Blue Cross & Blue Shield of Greater N.Y., 124 AD2d 900, 902 [3d Dept 1986]).
Defendant Keasbey was a small New York State insulating company that began operations in 1885, with operations in New York, New Jersey, and Connecticut. Defendant Keasbey’s insulation contracting operations included installing, repairing, renovating, and removing insulation at various commercial, industrial, and government job sites. Defendant Keasbey *229 regularly used material containing asbestos in insulation contracting operations at those sites, including the powerhouses of Consolidated Edison of New York (Con Ed) and other utilities. Defendant Keasbey complied with Con Ed’s specifications requiring the use of asbestos-containing insulation at Con Ed’s powerhouses during the 1950s and 1960s. After the dangers of asbestos became known, Con Ed directed in 1971 and 1972 that asbestos no longer be used at Con Ed’s sites, with which defendant Keasbey complied. Although defendant Keasbey itself issued a directive in the early 1970s banning the use of asbestos-containing products, defendant Keasbey did use such material after 1972.
In addition to performing insulation activities, defendant Keasbey mixed and distributed two asbestos-containing finishing cements under its own brand names: Rex and RAKCO. As testified to by defendant Keasbey’s former president at his deposition, straight sale of asbestos products by defendant Keasbey constituted only about one or two percent of defendant Keasbey’s business, with the balance being insulation contracting operations. The removal (rip out) work by defendant Keasbey of old asbestos-containing insulation was a relatively small part of the work of defendant Keasbey, which it began in the late 1980s or early to mid 1990s.
For some contracts, defendant Keasbey had a portion of the materials that it used shipped directly from the manufacturer to the job site. At times, when defendant Keasbey used Rex and/or RAKCO at a construction site, defendant Keasbey would ship these materials from its warehouse to the site using its own trucks.
When defendant Keasbey cut, sawed, mixed, and removed asbestos-containing materials as part of its insulation operations at various job sites, other individuals at those sites were exposed to asbestos dust. Some of the individuals that have contracted asbestos-related diseases have sued defendant Keasbey seeking compensation.[2]
Plaintiffs’ policies contain two basic types of coverage for asbestos claims: premises/operations coverage and products hazard/completed operations hazard coverage. In plaintiffs’ policies, “ ‘products hazard’ includes bodily injury . . . arising out *230 of the named insured’s products . . . but only if the bodily injury . . . occurs away from the premises owned and rented to the named insured and after physical possession of such products has been relinquished to others.” The plaintiffs’ policies define the completed operations hazard as including “bodily injury . . . arising out of operations . . . but only if the bodily injury . . . occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured.” Plaintiffs’ primary policies define “aggregate” limits with respect to products and completed operations claims as follows: “the total liability of [plaintiffs] for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury stated in the schedule as ‘aggregate.’ ”
The burden of proving coverage is on the insured, and the burden of proof that there is an exclusion thereto is on the insurer (see Consolidated Edison Co. of N.Y. v Allstate Ins. Co., 98 NY2d 208, 218 [2002]). Plaintiffs concede that they have the burden of proof on their affirmative defenses to coverage, on which plaintiffs seek declarations in the second cause of action, i.e., waiver, laches and other equitable doctrines, and statute of limitations.
In Frontier Insulation Contrs. v Merchants Mut. Ins. Co. (91 NY2d 169 [1997]), a declaratory judgment action as to the defendant insurers’ obligations to defend and indemnify the plaintiff insured, the Court of Appeals addressed a products hazard exclusion versus premises/operations coverage. There, the insurance companies argued that all of the claims by the injured parties in underlying personal injury actions came within the products hazard exclusion because the allegations were that the injuries were all caused by exposure to the plaintiff asbestos contractor’s asbestos products. The Court of Appeals stated that the contention “misses the mark” because, in determining whether a products hazard exclusion is applicable, a court should not merely look at whether the product caused the loss, “but rather ‘[should focus] on the location of the accident and the possession of the product’.” (Id. at 175.) The Court recognized the distinctions between products hazard coverage for insurable risks due to a defective product that has been put into the stream of commerce (products hazard coverage or, at issue in that case, exclusion from such coverage); versus completed operations coverage, which covers the risks of *231 loss for injuries that arise out of the operations of the insured that have been completed and occur away from the premises of the insured; versus risks that arise due to injuries from the defective product at the insured’s premises or while the work with the product is still in progress (premises/operations coverage) (id. at 176). This last category is to cover injuries to non-employees of the insured who are injured by the product of the insured at its business premises or during operations occurring away from those premises while the insured still controls the job site where the injury occurs (id.). If the product has been relinquished by the insured at a location away from the insured’s premises, then products hazard coverage applies (id.). If relinquishment has not occurred, and the operations have not been completed, then operations coverage applies.
Here, the claims by all of the claimants in the underlying actions were that they were injured away from the premises of defendant Keasbey. Plaintiffs have not demonstrated that the injuries occurred after relinquishment of the asbestos products or after the operations were completed (see discussion below). To the contrary, the evidence has shown that the injuries happened while the installation operations of defendant Keasbey were ongoing, which were covered under the operations coverage provisions of the subject insurance policies (see id. at 177-178).
Plaintiffs argue that the asbestos products were “drop-shipped” to the site and that relinquishment of the products occurred before defendant Keasbey later used the products in its construction operations. Even if under some circumstances physical possession of asbestos products had been temporarily relinquished to others at a work site, defendant Keasbey’s workers reacquired the products and used them at the site. The risks of injuries during operations grows out of the use of the asbestos products during the operations. This is to be distinguished from the risks growing only from the product itself, not from the installer’s use of it. The latter would be covered by the operations coverage, and whether the injury occurred before or after the work was completed would determine whether the operations or completed operations coverage would be applicable. If the risk came from only the products and not from their use during operations, then the products hazard coverage would apply, normally to provide coverage to a manufacturer or seller of the product, not for a contractor who was using the product during operations. Here, as the risks of injuries grew out of de *232 fendant Keasbey’s work with asbestos during its operations away from its premises, then operations coverage is applicable.
Furthermore, James Nagy, a retired claims analyst for plaintiffs, testified at his deposition that some claims against installers did not fall within the products hazard or completed operations hazard but rather were considered operations claims. Further, in 2002-2003, plaintiffs settled actions by injured claimants suing defendant Keasbey for a total of $2,865,000. Because plaintiffs considered the products hazard aggregate of the primary and excess policies to be used up before then and because the attorneys for asbestos claimants had sent their May 15, 2001 letter, plaintiffs did not categorize the claims as products hazard but rather as “BODI,” which meant bodily injury. At that point in time, because plaintiffs believed that the products hazard aggregates of plaintiffs insurance policies issued to defendant Keasbey had been exhausted years earlier by the powerhouse settlement, yet still paid the $2,865,000 settlement amount, plaintiffs only could have been categorizing the claims under the remaining coverage under the policies: operations coverage.
Therefore, on the first cause of action, plaintiffs are not entitled to the first declaration sought or the alternative declaration. To the extent plaintiffs are not entitled to a declaration in their favor, the court must declare against them (Lanza v Wagner, 11 NY2d 317, 334 [1962], appeal dismissed 371 US 74 [1962], cert denied 371 US 901 [1962]; see 397 W. 12th St. Corp. v Zupa, 34 AD3d 236, 237 [1st Dept 2006]; Optical Exch. of 35th St. v Soung E. Hong, 292 AD2d 218 [1st Dept 2002]). Thus, the court will declare in its separate judgment that generally the underlying asbestos personal injuries actions do not fall within the products aggregates. Plaintiffs have not shown that they are entitled to any further declaration on the first cause of action as to the individual underlying asbestos actions, which will have to await adjudication therein to see whether any do fall under the products hazard/completed operations aggregates. The court cannot make a determination as to any of those individual actions because to obtain such relief an insurer must demonstrate “as a matter of law that there is no possible factual or legal basis on which the insurer may eventually be held liable under its policy.” (First State Ins. Co. v J & S United Amusement Corp., 67 NY2d 1044, 1046 [1986].) Plaintiffs have not done so. As to the completed operations aggregates portion of the first cause of action, the court cannot determine now that any of the *233 underlying asbestos personal injury actions concern operations that were completed before February 15, 1970, so that too will have to await further adjudication.
Plaintiffs’ Second Cause of Action
Plaintiffs seek declarations in the wherefore clause of the complaint that
“the Policies’ Products Aggregates are exhausted; “Keasbey has waived any argument that the Policies’ Products Aggregates are not exhausted;
“if Keasbey still existed, it would be barred by laches and other equitable doctrines from arguing that the Policies’ Products Aggregates are not exhausted;
“if Keasbey still existed, it would be barred by applicable statutes of limitations from suing for breach of contract based on the premise that the Policies’ Products Aggregates are not exhausted;
“Individual Defendants can fare no better than Keasbey as subrogees to Keasbey (or otherwise seeking rights through Keasbey) and thus are subject to the defenses stated above; and “at a minimum, any party challenging such exhaustion must carry all burdens of proof with regard to such challenge.”
As stated above, the products aggregates of the plaintiffs’ primary policies were exhausted. No party affirmatively disputes that. Thus, the court will declare to that effect. Given that there is no real dispute on that point, the other requests for relief in the wherefore clause of the second cause of action are academic although the class defendants disputed all other parts thereof, except the request as to the class defendants being subject to the enumerated defenses.
In the conclusion of plaintiffs’ proposed findings of fact and conclusions of law, plaintiffs assert that defendant Keasbey and the class defendants have no coverage for asbestos claims under plaintiffs’ insurance policies for the reasons set forth in the first through fourth, and eighth causes of action. Thus, the court will analyze those contentions as applying to the position of the class defendants that there is coverage under plaintiffs’ policies beyond the exhausted primary policies’ aggregates for products hazard/completed operations coverage.
*234 Plaintiffs — Waiver
“Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable. Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.” (General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist., 85 NY2d 232, 236 [1995] [citations omitted].)
An insured “is conclusively presumed to have known, understood and assented to [an insurance policy’s] terms (see, Metzger v Aetna Ins. Co., 227 NY 411).” (Busker on Roof Ltd. Partnership Co. v Warrington, 283 AD2d 376, 377 [1st Dept 2001].) Thus, contrary to the contentions of the class defendants, defendant Keasbey is irrebutably presumed to have known of and understood that it had the right to operations coverage under the subject policies for claims of workers injured by asbestos used by defendant Keasbey’s employees.
Plaintiffs have not shown that defendant Keasbey intended to waive its right to invoke operations coverage under the subject policies for the claims asserted by the class defendants. In the early 1990s, New York state and federal judges consolidated hundreds (or more) of asbestos claims in the “powerhouse cases.” Defendant Keasbey was a defendant in those consolidated actions. While the powerhouse cases proceeded, plaintiffs engaged in settlement discussions with counsel for the claimants therein. As plaintiffs emphasize, defendant Keasbey had pushed to bring in its excess carriers to increase the amount of coverage available to settle the state powerhouse cases because of the potential that recovery by the plaintiffs there might have exceeded the aggregate amounts of products hazard coverage left under the subject policies, and defendant Keasbey feared that it would be forced out of business after a multimillion dollar verdict against defendant Keasbey in one of the state powerhouse cases and the potential of a large punitive damage award therein. Defendant Keasbey did accept the excess carriers’ contributing their funds to the state powerhouse settlement and did not object to the cost sharing agreement among the excess carriers, which expressly treated the asbestos claims in the state powerhouse cases as products hazard claims subject to the aggregate limits.
Defendant Keasbey did through its actions waive any right that it may have had to seek to have the past claims, which were already classified as products hazard claims and paid under *235 the aggregates for those claims, reclassified as operations claims, in order to obtain any more coverage available for them under the per occurrence operations provisions of the primary policies and excess coverage over that limited coverage. However, none of the arguments of plaintiffs lead to the conclusion that defendant Keasbey intended to give up its right to premises/ operations coverage for the pending claims of the class defendants. Plaintiffs have not sustained their burden of proof that defendant Keasbey had any such intention. Nor did plaintiffs in any way show that the class defendants themselves waived their right to seek operations coverage. Therefore, the court will declare that the class defendants did not waive their rights to assert that they have operations coverage for asbestos claims under plaintiffs’ insurance policies. However, the court will not declare in favor of defendant Keasbey because defendant Keasbey no longer exists and for the reason stated above. Issuing a declaratory opinion on this point would be merely advisory and would have no practical effect (see Cuomo v Long Is. Light. Co., 71 NY2d 349, 354 [1988]).
Plaintiffs — Laches, Ratification, Estoppel, and Judicial Estoppel
Laches may be a viable equitable defense to a declaratory judgment action (see Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 816 [2003]; Krieger v Krieger, 25 NY2d 364, 370-371 [1969]). The doctrine of laches may be applicable even though the statute of limitations has not run (Saratoga County Chamber of Commerce, 100 NY2d at 816). For a laches defense to succeed, the delay in commencing an action must be unreasonable (Matter of Dreikausen v Zoning Bd. of Appeals of City of Long Beach, 98 NY2d 165, 173 n 4 [2002]). Prejudice to the parties asserting laches must be demonstrated (Saratoga County Chamber of Commerce, 100 NY2d at 816).
As discussed above, defendant Keasbey was aware that the asbestos claims were being treated as products hazard claims subject to and exhausting the aggregate 1’mits of the primary insurance policies and that the excess insurance carriers thus were contributing to the settlement of the state powerhouse cases when they settled in May 1992. Defendant Keasbey never brought any action for a declaratory judgment or any other cause of action asserting that there should be operations coverage for asbestos claims against said defendant. Numerous material witnesses have died since 1992, and relevant documents are no longer available to plaintiffs (see Chemicraft Corp. v Seickel *236 & Sons, 161 AD2d 250, 251 [1st Dept 1990]). Defendant Keasbey is guilty of laches, but the court will not declare that defendant Keasbey would be barred by laches from arguing that the subject policies’ products aggregates are not exhausted because again such a declaration would constitute an advisory opinion.
The class defendants are in a different position than defendant Keasbey. The laches defense is separate as to defendant Keasbey and the class defendants. Any claims by the class defendants against plaintiffs would be pursuant to Insurance Law § 3420 (a) (2), which reads in pertinent part:
“(a) No policy or contract insuring against liability for injury to person . . . shall be issued or delivered in this state, unless it contains in substance the following provisions or provisions which are equally or more favorable to the insured and to judgment creditors so far as such provisions relate to judgment creditors: . . .
“(2) A provision that in case judgment against the insured or his personal representative in an action brought to recover damages for injury sustained or loss or damage occasioned during the life of the policy or contract shall remain unsatisfied at the expiration of thirty days from the serving of notice of entry of judgment upon the attorney for the insured, or upon the insured, and upon the insurer, then an action may, except during a stay or limited stay of execution against the insured on such judgment, be maintained against the insurer under the terms of the policy or contract for the amount of such judgment not exceeding the amount of the applicable limit of coverage under such policy or contract.”
The Appellate Division held in affirming this court (16 AD3d at 355) that “until [the class defendants] obtain a judgment against [defendant Keasbey] that goes unsatisfied, [the class] defendants lack standing to enforce insurance policies to which they were not parties.” (Citations omitted.) Accordingly, any member of the defendant class can only sue plaintiffs after he or she obtains a judgment in his or her personal injury action that remains unsatisfied, pursuant to Insurance Law § 3420 (a) (2) (see Lang, 3 NY3d at 355). The right of defendant class members to sue plaintiffs does not come through defendant Keasbey directly, but rather the standing to sue is derived entirely from Insurance Law § 3420 (a) (2) (see id. at 353-354).
*237 The First Department has stated in an action pursuant to Insurance Law § 3420 (a) where the defense at issue was the insured’s noncooperation under the insurance policy: “The insurer’s defenses in such an action are limited to those it would have against the insured.” (Rucaj v Progressive Ins. Co., 19 AD3d 270, 273 [1st Dept 2005] [citations omitted].) That should not be held to mean that all of the insurer’s defenses against the insured are available against an injured claimant, but rather only that the insurer can have no more defenses than those. The defenses that the insurer would have against the insured that would be applicable against the injured claimant are those that grow out of “the terms of the policy,” as per Insurance Law § 3420 (a) (2), such as not complying with the requirements under the insurance policy to give notice and cooperate with the insurer (see First State Ins. Co., 67 NY2d at 1046). Defenses such as laches, waiver, ratification, estoppel, and statute of limitations are affirmative defenses, which are based upon the individual actions of the party against whom the defenses are asserted, and the circumstances supporting such defenses all arise outside the terms of the policy. Those defenses are personal to defendant Keasbey (cf. Harris v Stony Clove Lake Acres, 202 AD2d 745, 746 [3d Dept 1994] [in a mortgage foreclosure action, the defendant-intervenor, who was the corporate defendant’s sole shareholder, could not assert defenses of improper service, statute of frauds, lack of consideration, invalid assignment, fraud in the inducement, and lack of authority because they could only be claimed by the corporate defendant]; Broad & Wall Corp. v O’Connor, 13 AD2d 462 [1st Dept 1961] [the defense of usury was available only to the borrower, not to strangers to the loan]).
As laches is an equitable defense, it would be inequitable to allow plaintiffs to interpose such a defense against the class defendants in any future action under Insurance Law § 3420 (a) (2), where defendant Keasbey sat on its right to bring a declaratory judgment action against plaintiffs after May 1992 to uphold defendant Keasbey’s right to operations coverage. This is especially so in light of defendant Keasbey’s going out of business in approximately 1995 and the class defendants having no right to bring their own actions when defendant Keasbey failed to do so, but rather having to wait until Insurance Law § 3420 (a) (2) gives the class defendants such a right. Thus, claims by the class defendants against plaintiffs have not occurred yet, and the class defendants have not committed laches. Therefore, the *238 court will declare that the class defendants are not subject to the defense of laches.
The class defendants contend that, as plaintiffs did not specifically plead as to the ratification and estoppel defenses in the complaint, plaintiffs waived those equitable defenses. They should have been pleaded (cf. Rametta v Kazlo, 68 AD2d 579, 583 [2d Dept 1979, Suozzi, J.P. and Cohalan, J., dissenting] [the equitable defense of unclean hands was not “properly invoked” by the defendant because the defendant did not plead the defense]).
Plaintiffs assert that, because defendant Keasbey accepted millions of dollars under its excess policies, while knowing that it could collect from them only if the asbestos personal injury claims were products hazard claims and that the primary policies’ aggregate limits therefor had been exhausted, the doctrine of ratification applies, without specifying in what way. Ratification can be explicit or implicit (Standard Funding Corp. v Lewitt, 89 NY2d 546, 552 [1997] [where the Court held that there was neither an express ratification nor would one be implied because the principal did not receive any benefits from its agent’s unauthorized, fraudulent acts]). An agreement can be ratified by adhering to it and receiving a benefit from the agreement without raising any objection to the agreement (Jaywyn Video Prods. v Servicing All Media, 179 AD2d 397, 398 [1st Dept 1992]). Here, as the benefits received were under the excess policies, not from the primary policies whose operations coverage is at issue, the ratification doctrine does not apply.
Plaintiffs argue that, due to defendant Keasbey’s repeatedly insisting that the excess carriers contribute to the state powerhouse settlement because it would exhaust the products hazard aggregates of the primary policies, defendant Keasbey is estopped from now taking a contrary position, as are the class defendants, who stand in the shoes of defendant Keasbey. Equitable estoppel requires “a lack of knowledge of the true facts; reliance upon the conduct of the party estopped; and a prejudicial change in position.” (River Seafoods, Inc. v JPMorgan Chase Bank, 19 AD3d 120, 122 [1st Dept 2005] [citation omitted].)
As the class defendants contend, plaintiffs did not show that they lacked knowledge of the true facts. In Continental Cas. Co. v ACandS, Inc. (US Dist Ct, ND Ill, No. 86C6119), the plaintiff there, who is also one here, Continental Casualty Company, stated in a response to the defendant’s motion that “many *239 asbestos-related bodily injury claims filed against ACandS invoke only negligence claims which do not fall within Aetna’s aggregate limits of liability.” The plaintiff there also said that “Aetna’s limit of liability provisions indicate that Aetna’s aggregate limits of bodily injury liability apply only to completed operations and products hazard claims.” There, the plaintiff Continental Casualty Company was an excess insurance carrier that was trying to avoid providing excess coverage, in arguing that the defendant ACandS, Inc.’s primary policy carrier, Aetna, was applying claims to its completed operations/products hazard aggregate limits, which should have been applied to its operations coverage. In a June 21, 1990 memorandum by CNA Insurance Companies (plaintiffs here), plaintiffs also asserted that before the state powerhouse settlement there were installation liability losses, which were paid for under other than products hazard/completed operations coverage aggregate limits. Therefore, plaintiffs were aware of the availability of operations coverage to asbestos personal injury claims long ago.
The evidence showed that plaintiffs classified the claims of injured claimants based on plaintiffs’ own assessment of the facts and allegations, not in reliance upon defendant Keasbey. Finally, plaintiffs did not prejudicially change their position but rather benefitted from their position by getting the excess carriers to pay out on their insurance policies, instead of plaintiffs having to pay out of their primary policies under the operations coverage, as limited by the per occurrence limits.
Plaintiffs contend that the class defendants should be judicially estopped from disputing that their claims are barred by the statute of limitations because of a statement made by the attorneys for the class defendants in their brief in support of a motion to the Appellate Division to stay the trial in this action. The estoppel argument does not hold because the assertion has to have been made in a prior action, not in the same one, for the doctrine to apply (Olszewski v Park Terrace Gardens, Inc., 18 AD3d 349, 350-351 [1st Dept 2005]). For the same reason, plaintiffs are wrong that the class defendants should be judicially estopped on the issues of their standing to sue defendant Keasbey, notice, and the “neither expected nor intended” portion of the “occurrence” definition of the subject insurance policies (see discussions below).
Again, the court will not issue an advisory opinion declaring that defendant Keasbey would not be barred by the equitable defenses of ratification, estoppel, and judicial estoppel from *240 arguing the subject policies’ products aggregates are not exhausted, but will declare that the class defendants are not subject to those defenses.
Plaintiffs — Statute of Limitations
The accrual dates for the claims of defendant Keasbey and the class defendants are different. As to defendant Keasbey, the applicable statute of limitations for breach of contract is six years (CPLR 213 [2]). The time begins to run at the time of the breach, even if no damage occurs until subsequently or the plaintiff is not aware that the breach occurred (Ely-Cruikshank Co. v Bank of Montreal, 81 NY2d 399, 402, 403 [1993]).
Just as with laches, the statute of limitations as to the class defendants arises outside of the insurance policies and is different for the class defendants as compared to defendant Keasbey. The claims of the class defendants do not accrue under Insurance Law § 3420 (a) (2) until after judgments are obtained against defendant Keasbey (Roldan v Allstate Ins. Co., 149 AD2d 20, 36 [2d Dept 1989]; see Lang, 3 NY3d at 354). Thus, the statute of limitations has not yet begun to run as to the class defendants. Therefore, again the court will not issue an advisory opinion as to defendant Keasbey but will declare that the class defendants are not subject at this time to the statute of limitations defense defeating any claims that may accrue in the future in favor of members of the defendant class.
Plaintiffs — Trigger
In plaintiffs’ third cause of action, they seek a declaration as to
“which policy periods are triggered by Asbestos Suits for Asbestos-Related Pleural Injuries; which policy periods are triggered by Asbestos Suits for cancer claims; and that any presumption of injury that might be applied for purposes of triggering policy periods does not apply for purposes of determining whether there is injury prior to relinquishment of Keasbey’s product or completion of Keasbey’s operations.”
There are four main theories on when insurance coverage for asbestos-related injuries is triggered: (1) upon exposure; (2) upon onset of a disease, whether or not it is discovered; (3) upon manifestation of a disease; or (4) a “continuous trigger,” which constitutes all three of the above (Continental Cas. Co. v *241 Rapid-American Corp., 80 NY2d 640, 650-651 [1993]). Coverage is triggered under the subject insurance policies when a bodily injury occurs. The 1970 through 1972 policies of plaintiffs state: “ ‘bodily injury’ means bodily injury, sickness or disease sustained by any person.” The 1973 and later policies of plaintiffs state: “ ‘bodily injury’ means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.”
Although the issue of which trigger theory applies was hotly contested at great length at trial, under Appalachian Ins. Co. v General Elec. Co. (19 AD3d 198 [1st Dept 2005], affd 8 NY3d 162 [2007]) and Matter of Midland Ins. Co. (269 AD2d 50, 61 [1st Dept 2000]), it is an occurrence that triggers coverage, and an occurrence is the exposure to asbestos by inhaling it (see discussion below), not an injury therefrom (id.). There is no distinction for asbestos-related pleural injuries or cancer claims, contrary to plaintiffs’ contention. Therefore, the court will declare that coverage for both types of injuries is triggered by exposure to asbestos during the policy periods.
As to the third prong of the third cause of action, no presumption of injury is being applied here, as the triggering of coverage turns on the exposure to asbestos, not the injury itself, which the First Department defined as the onset of a disease (Matter of Midland Ins. Co., 269 AD2d at 61). Thus, this court will not declare on that issue because the court is “prohibited from giving advisory opinions or ruling on ‘academic, hypothetical, moot, or otherwise abstract questions’ (Hearst Corp., 50 NY2d at 713).” (Saratoga County Chamber of Commerce, 100 NY2d at 810-811.)
Plaintiffs — Pollutant Exclusion
In plaintiffs’ fourth cause of action, they generally ask that this court declare “the appropriate application to the Asbestos Suits of all terms of the Policies not addressed in other causes of action, including the pollutant exclusions; the ‘occurrence’ definition; the ‘per-occurrence’ limits; the ‘per person’ limits;[3] and provisions relating to notice, cooperation, and tender of defense.” The court will only declare as to these terms specifically addressed by the parties.
Plaintiffs’ policies for the periods 1972 through 1987 exclude coverage for
“bodily injury or property damage arising out of the *242 discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge is sudden and accidental.”
To invoke an exclusion to deny coverage, the policy language must be clear, unmistakable, and specific, and is to be narrowly construed, and the insurer bears the burden of showing that the exclusion is applicable to the particular case and is not subject to any other reasonable interpretation (Seaboard Sur. Co. v Gillette Co., 64 NY2d 304, 311 [1984]). This same clause in plaintiffs’ policy has been interpreted to be ambiguous and thus unenforceable in a declaratory judgment action as to the obligation to defend personal injury and wrongful death actions concerning asbestos-caused injuries (Rapid-American Corp., 80 NY2d at 653-655). Plaintiffs have not sustained their heavy burden to demonstrate that the exclusion applies in this particular case (id. at 654). For many years, it has been plaintiffs’ custom and practice to both defend and pay out under the subject policies without invoking this pollution exclusion. Thus, plaintiffs’ own interpretation of this ambiguous clause works against its position in the action (id. at 655). Furthermore, plaintiffs never disclaimed coverage under the pollution exclusion (cf. American Ref-Fuel Co. of Hempstead v Employers Ins. Co. of Wausau, 265 AD2d 49, 54 [2d Dept 2000] [the defendant’s disclaimer under a pollution exclusion provision of the insurance policy more than four months after the plaintiff gave notice of its claim was untimely as a matter of law]). Therefore, the court will declare that the pollution exclusion of the subject policies does not bar coverage thereunder.
Plaintiffs — Occurrence, Per-Occurrence Limits, and Neither Expected Nor Intended
Occurrence is defined in plaintiffs’ policies as “an accident including injurious exposure to conditions, which results during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.” In Appalachian Ins., the Court of Appeals interpreted a similar insurance policy definition of “occurrence” in asbestos personal injury litigation to require a case-by-case analysis of the time and space relationships between the various incidents that caused injuries in order to determine whether the incidents were part of a continuum and thus one occurrence, or separate *243 occurrences unconnected by time and location (8 NY3d at 168, 174; see Reardon and McGarry, New York Court of Appeals Roundup, Single Versus Multiple Insurance “Occurrences,” NYLJ, Mar. 8, 2007, at 3, col 1). Although there could be circumstances of asbestos-causing injurious incidents that constitute part of a continuum, here the events that led to the injuries to members of the defendant class all took place at various work sites over the course of many years. Thus, the class defendants are entitled to a declaration that each individual class member’s exposure to conditions resulting in bodily injury constitutes a separate occurrence under the “occurrence” definition and “per-occurrence” limits of the subject insurance policies.
Plaintiffs have the burden of demonstrating that defendant Keasbey expected or intended members of the defendant class to be injured by asbestos (see Rapid-American Corp., 80 NY2d at 650). The issue is whether defendant Keasbey expected or intended that damages would result, not whether defendant Keasbey’s intentional acts caused damages (id. at 649). The attorney who defended defendant Keasbey on many underlying asbestos personal injury actions testified that defendant Keasbey did not even become aware of the hazard of asbestos-containing insulation products until the late 1960s or possibly even the 1970s. He further testified that, not surprisingly, no one from defendant Keasbey ever told him that it intended to have anyone get ill from asbestos. It was no shock that plaintiffs never countered this evidence. As to defendant Keasbey’s expectation, plaintiffs did not argue that point in their posttrial submissions. In any event, plaintiffs did not show that defendant Keasbey had any expectation that any individual worker would be injured by asbestos. Plaintiffs have not sustained their burden of proof on the expected and intended issue. The court will declare that coverage cannot be denied because the insured expected or intended bodily injury to an injured class member.
Plaintiffs — N otice
Plaintiffs contend that defendant Keasbey and the class defendants have not given plaintiffs notice, and challenge the adequacy of notice “as to any given claim.” As a precondition to plaintiffs’ duty to defend and/or indemnify, the insured, defendant Keasbey, must have provided notice of the “occurrence” and the claim. The subject insurance policies’ “notice of occurrence” provisions state:
“In the event of an occurrence, written notice *244 containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the insured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.”
The subject “notice of claim” clauses provide: “If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.”
An insured’s providing timely notice of an occurrence “as soon as practicable” is a condition precedent to an insurer’s liability (Great Canal Realty Corp. v Seneca Ins. Co., Inc., 5 NY3d 742, 743 [2005]; DiGuglielmo v Travelers Prop. Cas., 6 AD3d 344, 345 [1st Dept 2004]). Such notice is to give the insurance company the opportunity to do an adequate investigation and protect the insurer’s interests (Security Mut. Ins. Co. of N.Y. v Acker-Fitzsimons Corp., 31 NY2d 436, 440 [1972]). The failure of an insured to satisfy this condition vitiates the policy (Great Canal, 5 NY3d at 743).
Individual members of the defendant class have the right to protect their interests by providing notice directly to plaintiffs (see Insurance Law § 3420 [a] [3]; Appel v Allstate Ins. Co., 20 AD3d 367, 368 [1st Dept 2005]). The defendant class members are not vicariously responsible for any delay on the part of defendant Keasbey in giving notice (Aetna Cas. & Sur. Co. v National Union Fire Ins. Co. of Pittsburgh, Pa., 251 AD2d 216, 220 [1st Dept 1998]).
Contrary to the class defendants’ argument, plaintiffs need not show that they were prejudiced by the failure to give timely notice of an occurrence (see Great Canal, 5 NY3d at 743; Long Is. Light. Co. v Allianz Underwriters Ins. Co., 24 AD3d 172, 173 [1st Dept 2005]; cf. Rekemeyer v State Farm Mut. Auto. Ins. Co., 4 NY3d 468, 472, 476 [2005] [where the insured gave timely notice of the occurrence (a car accident), the insurer had to show that it was prejudiced by the late notice of the supplementary uninsured/underinsured motorists claim before the carrier could properly disclaim that the accident was covered]). It is undisputed that neither defendant Keasbey nor the class defendants gave specific notice of their occurrences to plaintiffs. Plaintiffs are correct that the May 15, 2001 letter by counsel for the class *245 defendants generally asserting the premises/operation theory of coverage did not give notice of any specific individual occurrences (cf. Steadfast Ins. Co. v Sentinel Real Estate Corp., 283 AD2d 44, 50, 53 [1st Dept 2001] [a loss run listing hundreds of claims did not comply with the notice of occurrence provision of the insurance policy]). Furthermore, the letter was sent to defendant Keasbey’s litigation defense counsel, not to plaintiffs.
However, under the circumstances, defendant Keasbey and the members of the defendant class did not have to give plaintiffs notice of each occurrence. The circumstances are different from other covered events, such as a car accident. There, it is usually clear when the accident occurs, and thus notice is normally easy to give. Here, members of the defendant class were exposed to asbestos at construction sites on which defendant Keasbey was working, probably every day that defendant Keasbey’s employees were working there too, but neither defendant Keasbey nor the members of defendant class knew when “injurious exposure” happened. Only some of the members of the defendant class developed disease, and as to those that did there was no way of their or defendant Keasbey’s knowing exactly when they did. It may very well be that on many work days some member of defendant class was injuriously exposed, but, as there was no way of knowing that for sure, one cannot know on what day an occurrence happened and thus on what days notice was required. It would be impractical to expect notices to have been sent day after day.
Furthermore, the standards of notice for members of the defendant class are less rigorous than those for defendant Keasbey (Appel, 20 AD3d at 368-369). There was no showing that the class defendants had access to defendant Keasbey’s insurance policies, and thus the class defendants would not have known that notice was required nor what specifics were required in the notices. Thus, under the circumstances, the class defendants’ giving of notice by serving their summonses and complaints on counsel for defendant Keasbey (see discussion below) was sufficient notice of occurrences (cf. Cirone v Tower Ins. Co. of N.Y., 39 AD3d 435 [1st Dept 2007] [where the injured claimant’s attorney and investigator unsuccessfully tried to identify the insurer and then sued the insured who notified the insurer of the occurrence, the plaintiffs action pursuant to Insurance Law § 3420 (a) (2) was not barred for lack of notice of the occurrence by the claimant]). This is especially so where plaintiffs were made aware of occurrences as soon as the first *246 asbestos actions were commenced, (after CPLR 214-c was enacted in 1986, thousands of asbestos-caused personal injury actions were filed in New York between that year and 1992, the year that the products aggregates were exhausted), and thus plaintiffs could have begun investigating immediately thereafter.
Plaintiffs did not specifically disclaim due to the lack of provision of notice of occurrences. Failure to provide written notice of disclaimer bars an insurer from disclaiming (Matter of Firemen’s Fund Ins. Co. of Newark v Hopkins, 88 NY2d 836, 837 [1996]). Timely notice of disclaimer must be given by an insurance company even where the insured has not given timely notice of the occurrence (see AIU Ins. Co. v Investors Ins. Co., 17 AD3d 259, 260 [1st Dept 2005]). Before commencing this action, plaintiffs had brought a (now discontinued) similar declaratory judgment action in Westchester county in October 2001. The bringing of a declaratory judgment action could constitute an adequate notice of disclaimer (see Generali-U.S. Branch v Rothschild, 295 AD2d 236, 237-238 [1st Dept 2002]). However, plaintiffs were aware well before then of the claims by members of the defendant class (some plaintiffs’ actions had already been assigned to trial clusters in 1999 and 2000), and that no notices of occurrences had been received from those defendants or defendant Keasbey. Thus, plaintiffs’ commencing of the declaratory judgment action did not make up for their failure to serve notices of disclaimer based on lack of notice of occurrences (see First Fin. Ins. Co. v Jetco Contr. Corp., 1 NY3d 64, 68-70 [2003]; Consolidated Edison Co. of N.Y. v Hartford Ins. Co., 203 AD2d 83, 84 [1st Dept 1994]).
As to notice of the claims by individual members of defendant class, they gave plaintiffs such notice by serving summonses and complaints on the litigation defense counsel for defendant Keasbey, as authorized by plaintiffs. In their attorneys’ reply memorandum in support of plaintiffs’ motion for partial summary judgment in this action, plaintiffs admitted that procedure occurred.
Plaintiffs did not ask for any specific declarations in the fourth cause of action of their complaint as to the notice or tender of defense provisions. Plaintiffs merely state in the conclusion of their proposed findings of facts and conclusions of law that defendant Keasbey and the class defendants have no coverage for asbestos claims for the reasons set forth in the fourth cause of action. As the parties did argue their positions as to no *247 tice and tender of defense, the court will declare that defendant Keasbey and the class defendants’ right to coverage for asbestos claims are not excluded under the notice and tender of defense provisions of the subject policies.[4]
Plaintiffs — Cooperation
Continental’s policies require the insured to cooperate in the defense of claims: “The insured shall cooperate with the company and, upon the company’s request, assist ... in the conduct of suits . . . and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.” The “insured” under standard policy language includes “any executive officer, director or stockholder thereof while acting within the scope of his duties as such” and, by a special defendant Keasbey endorsement, any employee of defendant Keasbey.
A carrier may disclaim coverage for failure to comply with the cooperation condition (see Somerstein Caterers of Lawrence v Insurance Co. of State of Pa., 262 AD2d 252, 252 [1st Dept 1999] [the insured’s “refusal to present its treasurer or bookkeeper for examination under oath respecting the loss claimed under the subject policy constituted a material breach of the policy’s cooperation clause and, as such, precluded appellants’ recovery of policy proceeds”]; Levy v Chubb Ins., 240 AD2d 336, 337 [1st Dept 1997] [“The willful failure of an insured to submit to an examination under oath and to supply all relevant material in compliance with the provisions of an insurance policy has been held to constitute a material breach of contract, and to preclude recovery”]).
Here, defendant Keasbey stopped communicating with plaintiffs by early 1994. Defendant Keasbey did not answer letters or phone calls by plaintiffs and their counsel, did not give any response as to a proposed interim cost-sharing agreement negotiated by defendant Keasbey’s excess insurance carriers, and did not appoint a liaison for litigation purposes. Defendant Keasbey’s conduct continued through 1994, though it remained in business until 1995.
An insurer has the burden to prove that the insured failed or refused to fulfill its responsibility to cooperate under an insur *248 anee policy (Matter of Empire Mut. Ins. Co. [Stroud — Boston Old Colony Ins. Co.], 36 NY2d 719, 721 [1975]). That burden is a heavy one (id.), in that the insurer must show that it proceeded diligently to attempt to obtain cooperation from the insured, that the efforts of the insurer were reasonably calculated to get that cooperation, and that, after those attempts, the insured’s attitude was wilfully and avowedly obstructive (Thrasher v United States Liab. Ins. Co., 19 NY2d 159, 168 [1967]). A disclaimer grounded on the failure of the insured to cooperate will only be permitted when its actions are deliberate (City of New York v Continental Cas. Co., 27 AD 3d 28, 32 [1st Dept 2005]). In an action by a class defendant under Insurance Law § 3420 (a) (2), the insurer has the burden of proving a refusal or failure to cooperate (Insurance Law § 3420 [c]).
Although plaintiffs did demonstrate the first two prongs of the burden against defendant Keasbey, and the court could infer the third from defendant Keasbey’s utter failure to respond, plaintiffs never issued a required timely disclaimer of coverage based on defendant Keasbey’s noncooperation (see Insurance Law § 3420 [d]; Allcity Ins. Co. v 601 Crown St. Realty Corp., 264 AD2d 315, 317 [1st Dept 1999]). Apparently plaintiffs stopped sending defendant Keasbey reservation of rights letters in 1989, and in any event such a letter would not constitute a notice of disclaimer (see Zappone v Home Ins. Co., 55 NY2d 131, 135 [1982]; Allcity Ins. Co. v Pioneer Ins. Co., 194 AD2d 424 [1st Dept 1993]). Therefore, defendant class is entitled to a declaration on plaintiffs’ fourth cause of action that plaintiffs may not disclaim coverage based on the noncooperation of defendant Keasbey.
Plaintiffs — Excess Policies
Plaintiffs sought declarations in the complaint that
“the aggregate limits in the first four Continental Excess Policies are exhausted;
“that Continental Excess Policy No. RDX 1779739, for the period May 8, 1978 to September 22, 1978, either (i) provides no coverage for Keasbey because the policy does not provide policy limits, or (ii) should be reformed to provide $4,000,000 in aggregate in [szc] limits and construed to apply in the same manner as the other Continental Excess Policies; and
*249 “whether any amounts remain available to Keasbey under Continental Excess Policy No. RDX 1779739, if it is reformed to provide limits.”
The parties stipulated to an additional request for a declaration as to the existence or nonexistence of another insurance policy, RDU 8047261, and the rights and obligations, if any, of plaintiffs and the defendant class under that policy. Plaintiffs and the defendant class subsequently stipulated that plaintiff Continental Casualty Company issued to defendant Keasbey excess policy numbers RDX 1779739 and RDU 8047261, which had aggregate limits of $4,000,000 and $1,000,000 respectively, and which had terms and conditions identical to those of excess policy number RDU 2939548 and plaintiffs’ standard form 1971 policy provisions, respectively, except for aggregate limits and policy periods. On April 27, 2007, the parties further stipulated that the only issues remaining to be decided related to three policies: RDX 1779739, RDU 8047261, and the stub policy (see discussion below).
Excess insurance policy number RDX 1779739 contains a defense coverage endorsement that makes defense costs paid by plaintiffs “included in, and not in addition to, the applicable limit of the company’s policy.” That means that the costs of plaintiffs in defending personal injury actions by injured claimants suing defendant Keasbey can be applied by plaintiffs against that policy’s $4,000,000 aggregate limit. It is not disputed that plaintiffs have spent more than $17,000,000 in defense costs since 2001. The defendant class has not shown that the claims that led to those defense costs should not be classified as products hazard claims. Thus, plaintiffs can categorize them as products hazard claims. Therefore, the aggregate limit therefor under policy number RDX 1779739 has been exhausted, although any right of the defendant class to operations coverage exists thereunder, and the court will declare so.
As discussed above, plaintiffs paid out $2,865,000 in settling actions of claimants in 2002-2003 after the products hazard aggregate were exhausted, and classified the claims as falling under operations coverage because no other coverage was left at that time. Plaintiffs are now contending that they should be able to use those payments to exhaust the remaining coverage under excess policy number RDU 8047261. Plaintiffs’ own representative, Michael Sehr, testified at his deposition that plaintiffs try to evaluate each claim individually based on the facts, law, and policy provisions, and that plaintiffs, as with *250 most insurance companies, would likely not recategorize claims that have been settled and paid. The court will declare that the aggregate limits of excess policy number RDU 8047261 are not exhausted.
Plaintiffs — Stub Policy
At issue is an excess liability insurance policy that covered from February 15, 1977 to February 15, 1978 with a $5,000,000 aggregate limit, and a declarations page for the policy that extended coverage through May 8, 1978 (the stub policy). The extension could mean either that the $5,000,000 aggregate limit covered the period from February 15, 1977 through May 8, 1978, as plaintiffs contend, or that there was a second separate $5,000,000 aggregate for the extended period of February 16, 1978 through May 8, 1978, as the class defendants argue.[5] The declarations page in evidence does not speak to the issue. It merely states: “This declarations page is issued in conjunction with and forms a part of the Umbrella Excess Third Party Liability Policy,” and “[t]his endorsement. . . forms a part of and is for attachment to the following described policy.” Numerous insurance policies were admitted into evidence, including another excess policy for 1972 through 1975, which states that, if the policy was issued for more than one year, the aggregate limit applied separately to each year and to any final, shorter than 12-month period. However, that language was not connected by testimony or documentary evidence to the stub policy, and the subject February 15, 1977 to February 15, 1978 excess policy, which was extended by the declarations page, was not placed into evidence.[6] Thus, the court did not have before it any such specific language in the 1977 through 1978 and stub insurance policies.
The burden of defendant Keasbey, and consequently the class defendants, is to prove coverage and the terms thereof (see Consolidated Edison Co. of N.Y., 98 NY2d at 218; cf. Roundabout Theatre Co. v Continental Cas. Co., 302 AD2d 1, 6 [1st Dept *251 2002] [the insured has the burden of showing that a loss was covered under the terms of the insurance policy]). Those defendants have not met their burden.
Thus, the $5,000,000 aggregate limit was for the entire period, as extended, from February 15, 1977 through May 8, 1978 (see Uniroyal, Inc. v American Re-Ins. Co., 2005 WL 4934215, *19-20 [NJ Super Ct, App Div, Sept. 13, 2005]; Diamond Shamrock Chems. Co. v Aetna Cas. & Sur. Co., 258 NJ Super 167, 224-226, 609 A2d 440, 468-469 [App Div 1992], cert denied 134 NJ 481, 634 A2d 528 [1993]; cf. Stonewall Ins. Co. v Asbestos Claims Mgt. Corp., 73 F3d 1178, 1216-1218 [2d Cir 1995] [where two excess insurance policies were in effect for part of a year, the term “annual period” was held to be ambiguous and resolved against the insurer to provide for a new full aggregate for the part of a year period]). The court will declare to that effect.
One Beacon
By stipulation, defendant One Beacon’s requests for relief were limited to those asserted in said defendant’s “Request for Findings of Facts and Conclusions of Law (Revised).” Defendant One Beacon asked therein for the following declarations:
“1. Any One Beacon coverage and defense obligation is limited to only those cases arising out of exposure to a Keasbey asbestos-containing product at either Indian Point Unit No.2 or Indian Point Unit #3.
“2. All of the pending claims asserted against Keasbey that arise from exposures at sites other than Indian Point #2 or #3 are not covered under any policy issued by One Beacon.
“3. Any claims seeking coverage and a defense from One Beacon for past and pending claims and/or seeking allocation for monies incurred in connection with past and pending claims are barred as a result of the failure to provide timely and adequate notice to One Beacon.
“4. All claims brought by members of the Defendant Class involving an alleged Indian Point exposure are product claims that fall within the products hazard definition of the One Beacon policies.
“5. Any covered claims are limited to the per person, per occurrence and aggregate limits and the ‘noncumulation’ provisions stated in the One Beacon *252 policies.
“6. Under the circumstances of this case, all claims asserted against Keasbey for exposure to asbestos at Indian Point Units #2 and/or #3 arise out of a single occurrence.”
Plaintiff and the class defendants oppose the issuance of all of the declarations.
Defendant One Beacon assumed the obligations under two Employers’ Liability Assurance Company (ELAC) insurance policies. The policies afford coverage for indemnification of damages for bodily injury caused by an occurrence arising out of work performed at Indian Point Units 2 and 3 respectively in Buchanan, New York, and for defense of any action brought against the insureds alleging such injury and seeking damages therefor. Thus, the court shall declare that any obligation of defendant One Beacon as to indemnification and defense under the subject policies is limited to only those actions arising out of exposure to a defendant Keasbey asbestos-containing product at either Indian Point Unit 2 or Indian Point Unit 3, and that all of the pending claims asserted against defendant Keasbey that arise from exposures at sites other than Indian Point Units 2 or 3 are not covered under the subject policies assumed by defendant One Beacon.
One Beacon — Notice
The original notice of accident provision of defendant One Beacon/ELAC’s policies was deleted by endorsement No. 7, which substituted the following:
“NOTICE OF ACCIDENT. WHEN AN ACCIDENT OCCURS, WRITTEN NOTICE SHALL BE GIVEN BY OR ON BEHALF OF THE INSURED TO THE COMPANY OR ANY OF ITS AUTHORIZED AGENTS AS SOON AS POSSIBLE AFTER NOTICE HAS BEEN RECEIVED IN THE INSURANCE DEPARTMENT OF UNITED ENGINEERS & CONSTRUCTORS INC. SUCH NOTICE SHALL CONTAIN PARTICULARS SUFFICIENT TO IDENTIFY THE INSURED AND ALSO REASONABLY OBTAINABLE INFORMATION RESPECTING THE TIME, PLACE AND CIRCUMSTANCES OF THE ACCIDENT, THE NAMES AND ADDRESSES OF THE INJURED AND OF AVAILABLE WITNESSES.”
To reflect a change in ownership, both policies were later *253 amended to substitute Westinghouse Electric Corporation for United Engineers & Constructors Inc. Endorsement No. 7 was amended to substitute the name of Westinghouse for United Engineers. Endorsement No. 3 to the policies states: “THE WORD ‘OCCURRENCE’ SHALL BE SUBSTITUTED FOR THE WORD ‘ACCIDENT’ ... IN THE POLICY.” Endorsement No. 15 to the defendant One Beacon/ELAC policy for Indian Point Unit 3 provides: “WESTINGHOUSE ELECTRIC CORPORATION IS AUTHORIZED AND, BY ACCEPTANCE OF THE POLICY, AGREES TO ACT ON BEHALF OF ALL INSURED WITH RESPECT TO ALL MATTERS RELATING TO THE INSURANCE AFFORDED BY THE POLICY.” Both United Engineers and Westinghouse were insureds under the subject defendant One Beacon/ELAC’s policies, pursuant to which defendant Keasbey was also insured as a subcontractor. The subject policies further provide: “If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.”
There was no evidence to demonstrate that notice of any occurrence was ever received by the insurance department of either United Engineers or Westinghouse. That was the predicate to Westinghouse, defendant Keasbey, or someone else on behalf of defendant Keasbey having to give notice of an occurrence to plaintiffs.
Also, defendant One Beacon received notices of claim, including from defendant Westinghouse (as well as from plaintiffs and the class defendants). The parties stipulated:
“Since 2002, One Beacon has on numerous occasions received claims from entities other than Keasbey who were seeking coverage for certain asbestos-related bodily injury claims under the same One Beacon policies that are at issue in this case. The notices received by One Beacon include [pending New York County Supreme Court actions] brought by claimants alleging asbestos exposure at Indian Point Nuclear Power Plant Units 2 and/or 3. The notices have been received by claim personnel at One Beacon from counsel for these entities (Westinghouse, Con Edison, Gerosa and Treadwell) and take various forms. Westinghouse would forward a Plaintiff Initial Fact Sheet filed by plaintiff usually accompanied by a copy of the complaint filed against Westing *254 house. The Complaints forwarded by Westinghouse, more often than not, would include Robert A. Keasbey Company as one of numerous defendants. Otherwise, the communications received from these other entities seeking coverage do not reference Keasbey. One Beacon has assigned claims department personnel to administer these accounts, who have received information about these accounts including information concerning claims filed against these accounts. In certain instances and under certain circumstances, which are the subject of various agreements, One Beacon has contributed to the defense of certain of these claims on each of these accounts. One Beacon continues to receive claims from these same entities and, depending upon the circumstances, contributes to the defense of certain claims for these accounts.”
Furthermore, defendant One Beacon is seeking a very broad declaration as to the alleged failure of notice that “[a]ny claims . . . are barred.” Given that defendant One Beacon has not demonstrated that all claims should be precluded, it cannot receive the declaration sought. Therefore, the court will declare that any claims seeking coverage and a defense from defendant One Beacon for past and pending claims are not barred as a result of the failure to provide timely and adequate notice to defendant One Beacon.
One Beacon — Per Person, Per Occurrence, Aggregate Limits, and Noncumulation Provisions
Each of the two One Beacon/ELAC insurance policies has a $500,000 per person and $2,500,000 per occurrence limit for bodily injury coverage. Each policy provides that it is subject to the limits of liability and other terms of the policy. The declaration page for each policy states the policy period for each: February 1, 1966 to June 1, 1969 for Indian Point Unit 2 and June 1, 1967 to February 1, 1972 for Indian Point Unit 3. Nowhere in either policy does it specify that the policy limits apply annually, as the class defendants contend, or over thé entire period of the policy, as defendant One Beacon argues. The class defendants have not shown that the policies should be interpreted to provide for annual coverage, and the court will not read such terms into the policies (see CSX Transp., Inc. v Commercial Union Ins. Co., 82 F3d 478, 483 *255 [DC Cir 1996]; Hercules, Inc. v AIU Ins. Co., 784 A2d 481, 495-496 [2001]; cf. Maryland Cas. Co. v W.R. Grace & Co., 1996 WL 169326, 1996 US Dist LEXIS 4500 [SD NY, Apr. 11, 1996] [the court did not use evidence of alleged industry trade and custom to vary the terms of the subject insurance policy, which did not specify annual aggregate limits, unlike another policy that did]).
The class defendants further argue that the subject policies have multiple limits because the policy periods were extended numerous times. The extensions were not new renewal policies but rather were by endorsements for various extensions, sometimes for as short as five days. The endorsements do not have any provision stating that they give separate coverage limits for each policy extension period. The extensions of the two defendant One Beacon wrap-up policies at issue apparently had the purpose of continuing the coverage until the various contractors completed their work at the two Indian Point sites. Therefore, as the class defendants have not shown that the extensions should be interpreted as they contend, the court will not do so, especially as the policies define all exposures to asbestos as a single occurrence, as discussed below (see Matter of Midland Ins. Co., 269 AD2d at 59-60; cf. Hiraldo v Allstate Ins. Co., 5 NY3d 508, 512-513 [2005] [due to a noncumulation provision in the three subject policies (three separate one-year policies, one of which was extended for another year), there was one total limit for plaintiffs’ covered loss of $300,000 for all three policies, not $900,000]; cf. Commercial Union Ins. Co. v Swiss Reins. Am. Corp., 413 F3d 121, 126-130 [1st Cir 2005] [in an action between an excess insurance company and its reinsurer, the court vacated and remanded the action for further proceedings in light of the reinsurance follow-the-fortunes doctrine, where the reinsurance policies had no definition of “occurrence,” which could have negated an annualization of coverage under the per occurrence policy limits of the three-year policy period; the excess policies had language defining “occurrence,” hostile to the annualization of coverage; both the excess and reinsurance policies contained “follow-the-form” clauses; and the primary policies provided for the per occurrence limits to be applied annually]; Society of R.C. Church of Diocese of Lafayette & Lake Charles, Inc. v Interstate Fire & Cas. Co., 26 F3d 1359, 1366 [5th Cir 1994] [as each child molestation during the three-year occurrence policy period triggered coverage, under the policy terms the losses were not annualized]).
*256 The insurance policy issued for Indian Point Unit 3 has an endorsement that reads:
“IT IS AGREED THAT IN THE EVENT OF AN ACCIDENT OR OCCURRENCE COVERED BY THIS POLICY AND ALSO COVERED BY THE EMPLOYERS’ LIABILITY ASSURANCE CORPORATION, LTD. POLICY [FOR INDIAN POINT UNIT #2] THE LIMITS OF LIABILITY FOR BOTH POLICIES COMBINED SHALL NOT EXCEED:
“BODILY INJURY LIABILITY — EXCEPT AUTOMOBILE
“$500,000. EACH PERSON “$2,500,000. EACH ACCIDENT “$2,500,000. AGGREGATE PRODUCTS.”
That means that, if a defendant class member was exposed to asbestos at both Indian Point Units 2 and 3, then the endorsement applies, and, if exposed at only one of the sites, then only the applicable policy for that site applies. The outcome is the same: in either case, there would be only one applicable $500,000 per person and $2,500,000 per occurrence limit.
One Beacon — Products Hazard Coverage
In defendant One Beacon/ELAC’s policies, “products hazard” is defined as:
“(1) goods or products manufactured, sold, handled or distributed by the named insured ... if the accident occurs after possession of such goods or products has been relinquished to others by the named insured . . . and if such accident occurs away from the premises owned, rented or controlled by the named insured . . .
“(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement.”
Again, as stated above, by endorsement to defendant One Beacon/ELAC’s policies, the word “occurrence” was substituted for “accident.” Defendant One Beacon/ELAC’s policies also contain premises/operations coverage.
Thirty named representatives of the defendant class alleged an exposure to asbestos at Indian Point, along with other sites. *257 One, George T. Ward, worked at Indian Point Unit 2 in the 1960s and 1970s while the insulation subcontractor defendant Keasbey was there. He alleged exposure to work performed by defendant Keasbey involving asbestos-containing products starting in the 1950s through the 1970s. Thus, because his claim grows out of continuing operations by defendant Keasbey, the claim would fall under the operations coverage, not the products hazard coverage (see discussion above entitled “Plaintiffs— Products Hazard/Completed Operations Coverage versus Premises/Operations Coverage”). Again, defendant One Beacon sought an all encompassing declaration as to “[a]ll claims.” Therefore, the court will declare that all claims brought by members of the class defendants involving an alleged Indian Point exposure are not product claims that fall within the products hazard definition of the defendant One Beacon/ELAC policies.
Defendant One Beacon has shown that some of the claims as alleged by the class defendants were products hazard claims. They would come under the declaration sought as to any covered claims falling under the aggregate limits stated in the policies. Therefore, the court will declare that any covered claims are limited to a single set of $500,000 per person and $2,500,000 per occurrence limits for the entire multiyear period for the policies, and that any covered products hazard claims are subject to the aggregate limits of the policies.
One Beacon — Occurrence
The circumstances are different as to defendant One Beacon as compared to plaintiffs, based upon the differences in their respective policies. The definition of “occurrence” under plaintiffs’ policies is similar to that of the policies at issue in Appalachian Ins. (8 NY3d at 174), while the policies of defendant One Beacon/ELAC contain an endorsement that compels a declaration in favor of defendant One Beacon: “All damage arising out of a continuous or repeated exposure to pollution or contamination shall be considered as arising out of one occurrence.” Paragraph 112 of defendant One Beacon’s request for findings of fact and conclusions of law states: “Further, [all claims] involve exposure to a continuous condition (i.e. alleged release of asbestos product fibers into working environment).” Asbestos exposure is “pollution or contamination” (see Rapid-American Corp., 80 NY2d at 653, and statutes and regulations cited therein). The policy provision is unambiguous, and applies here. *258 Therefore, the court will declare that, under the circumstances of this action, all claims asserted against defendant Keasbey for exposure to asbestos at Indian Point Units 2 and 3 arose out of a single occurrence.
Conclusion
The court will make the appropriate declarations according to these findings of fact and conclusions of law. Pursuant to the separate decision of this court, a judgment will be settled, pursuant to 22 NYCRR 202.48 (c).

. After the Court of Appeals ruled in Appalachian Ins. Co. v General Elec. Co. (8 NY3d 162 [2007]), the parties stipulated to open the trial record again in order to make further arguments as to the impact of that decision, and then the record was finally closed.

. There are no claims at issue here by former employees of defendant Keasbey, who would be covered by workers’ compensation, and consequently are not permitted to sue defendant Keasbey (Workers’ Compensation Law §11).

3. The court will not declare as to the “per person limits” because the parties did not argue this issue.

. The court will declare as to defendant Keasbey on these issues because, as discussed above, these defenses are derived from the policy terms, and thus the court must first interpret them as to defendant Keasbey before ruling as to the class defendants’ rights, pursuant to Insurance Law § 3420 (a) (1).

. The plaintiffs did not ask for a ruling on this issue in their complaint. Because the parties argued the issue in their posttrial submissions, the court solicited a clarification as to whether relief was being sought as to the stub policy. The parties submitted a stipulation, dated April 27, 2007, that the issue was to be ruled upon by the court.

. The February 15, 1977 to February 15, 1978 excess insurance policy, which the stub policy extended, apparently was exhibit 7 to an April 29, 2005 letter to this court from the attorneys for the class defendants. However, that letter and the 1977-1978 policy were never admitted into evidence at trial.