[871 NYS2d 48]

CONTINENTAL CASUALTY COMPANY et al., Appellants-Respondents, v EMPLOYERS INSURANCE COMPANY OF WAUSAU et al., Respondents-Appellants, and MICHAEL O'REILLY et al., Respondents, et al., Defendant.

First Department, December 30, 2008

## APPEARANCES OF COUNSEL

*Duane Morris LLP*, New York City (*Thomas R. Newman* and *Kimball Lane* of counsel), and *Ford Marrin Esposito Witmeyer & Gleser, L.L.P.*, New York City (*Charles A. Booth* and *Kyle Medley* of counsel), and *Grippo & Elden LLC*, Chicago, Illinois (*Gary M. Elden, Todd C. Jacobs, Irving C. Faber, Marc S. Lauerman, John E. Bucheit* and *Brian J. Mowbray*, of the Illinois bar, admitted pro hac vice, of counsel), for appellants-respondents.

*Zelle Hofmann Voelbel Mason & Gette LLP*, Minneapolis, Minnesota (*Rolf E. Gilbertson*, of the Minnesota bar, admitted pro hac vice, of counsel), and *Seward & Kissel LLP*, New York City (*Dale C. Christensen, Jr.* of counsel), for Employers Insurance Company of Wausau, respondent-appellant.

*Hardin, Kundla, McKeon & Poletto, P.A.*, New York City (*George R. Hardin* and *John R. Scott*, of the New Jersey bar, admitted pro hac vice, of counsel), for Employers Liability Assurance Company, respondent-appellant.

*Gilbert Randolph LLP*, Washington, D.C. (*August J. Matteis, Jr., David N. Webster* and *Charley C. Sung*, of the District of Columbia bar, admitted pro hac vice, and *Richard D. Shore, Ted J. Feldman* and *Mark Tanney* of counsel), and *Collier, Halpern, Newberg, Nolletti & Bock, LLP*, White Plains (*Philip M. Halpern* and *Scott M. Salant* of counsel), and *Weitz & Luxenberg P.C.*, New York City (*Perry Weitz* of counsel), for respondents.

*Simpson Thacher & Bartlett LLP*, New York City (*Andrew T. Frankel, Mary Beth Forshaw* and *Elisa Alcabes* of counsel), for amicus curiae.

## OPINION OF THE COURT

CATTERSON, J.

In this declaratory judgment action, plaintiff insurance companies seek a declaration that they do not have a duty to indemnify the now-defunct insured, Robert A. Keasbey Co., in pending asbestos-related claims. Although the tort claims of the defendant class (hereinafter referred to as the claimants) have not yet been adjudicated, and even though a judgment must be entered against Keasbey before an action could be brought under Insurance Law § 3420 (a) (2) against the plaintiffs, the insurers seek the declaration that all the pending claims in the underlying complaints against Keasbey fall within the products hazard/completed operations coverage. Such coverage is subject to aggregate limits which indisputably were exhausted after the insurers paid out more than $110,000,000 in negotiated settlements on policies issued to Keasbey.

Continental Insurance Co. and American Casualty Co. (hereinafter referred to as CNA) initiated this action first against its insured, Keasbey, as aggregate limits were being exhausted by lawsuits that had been brought against Keasbey as a manufacturer, seller and distributor of an inherently dangerous product, asbestos. In May 2001, counsel for about 20,000 claimants informed Keasbey and CNA that these claimants would be pursuing a new theory of liability (non-products or "operations" coverage), which was not subject to aggregate limits, and thus opened up Keasbey and its insurers to "perpetual coverage."

The record reflects that now-dissolved defendant Keasbey was an insulation contractor that installed, repaired, renovated and

removed insulation at various sites in and around New York since the late 1800s. Keasbey distributed and installed insulation materials for industrial and commercial facilities including the powerhouses for Consolidated Edison (hereinafter referred to as ConEd) and other utilities. Until about 1972 those insulation materials contained asbestos. Keasbey also mixed and distributed two asbestos-containing finishing cements.

Most of the litigation against Keasbey occurred as a result of the post-World War II construction boom in the 1950s and 1960s, and the need for new and upgraded powerhouses. The increase in construction activity also increased the use of asbestos-containing insulation in powerhouses and other commercial facilities.

By 1965, however, studies conducted by Dr. Irving Selikoff and his research team at Mt. Sinai Hospital revealed the potential dangers of asbestos. Dr. Selikoff's studies sparked concern among asbestos workers, other trades and their employers about the use of asbestos.

As a result of these developments, ConEd directed, in 1971 and 1972, that asbestos no longer be used at ConEd sites; Keasbey complied with ConEd's directive. Keasbey management also issued a written directive in the early 1970s banning the use of asbestos-containing products.

The subject insurance policies are 17 primary level comprehensive general liability (hereinafter referred to as CGL) policies that were issued by CNA to Keasbey between February 1970 and February 1987. None of the CNA policies issued to Keasbey during this time period contained asbestos-related exclusions.[1] The primary policies generally insured Keasbey against claims for "bodily injury" caused by an "occurrence."

The CNA policies have aggregate limits that apply only to claims that come within the definition of "products hazard" or "completed operations hazard." The products hazard aggregates range from $300,000 to $1,000,000 per policy, with combined aggregate limits of $8,700,000. Under the policies, "products hazard" "includes bodily injury . . . arising out of the named insured's products . . . but only if the bodily injury . . . occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others."

The completed operations hazard is defined as: "bodily injury and property damage arising out of operations . . . but only if

---

1. CNA also issued excess policies.

the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to . . . the named insured.''

The CNA policies contain no aggregate limits for claims that are not products hazards, such as "operations" claims. The only limitation for such coverage is the per occurrence provision in each policy. Between 1972 and 1978 CNA additionally issued Keasbey five excess policies with aggregate limits totaling $50 million.

Since 1986, thousands of individuals have brought tort claims against Keasbey for asbestos-related injuries. Most of the claimants are tradesmen and other individuals who worked for other companies and who were allegedly exposed to asbestos while working in the vicinity of Keasbey insulators.

In the early 1990s, New York state and federal judges consolidated hundreds of the asbestos claims in litigation known as the "Powerhouse Cases." Keasbey was a defendant in those consolidated actions. Claimants tried the cases against Keasbey on a strict products liability and negligent "failure to warn" theory emphasizing Keasbey's role as manufacturer and distributor of asbestos products.

None of the plaintiffs in the Powerhouse Cases ever presented any evidence of Keasbey's negligent installation. Until 2001 the insured, the insurers, primary and excess carriers, and the claimants all treated Keasbey claims as strict products liability claims based on the inherently dangerous nature of Keasbey's asbestos products.

While the Powerhouse Cases proceeded, CNA, among others, engaged in settlement discussions with counsel for the claimants. As CNA emphasizes, Keasbey pushed at that time to bring in its excess carriers because the claimed damages appeared to exceed the aggregate amounts of products coverage left under the subject primary policies. Keasbey accepted the excess carriers' contributing funds to the State Powerhouse Cases, and did not object to the cost-sharing agreement among the excess carriers, which expressly treated the asbestos claims as products hazard claims subject to the aggregate limit.

Thus, by May 1992, CNA exhausted its aggregate limits of $8,700,000 in the State Powerhouse Cases. Between May 1992 and May 2001, the excess insurance carriers, including CNA, paid out more than $100,000,000 under their policies and, for all intents and purposes, CNA exhausted its excess policy limits

also.[2] Keasbey ceased doing business in 1995, and was dissolved in 2001.

By letter dated May 15, 2001, the attorneys for the majority of the remaining asbestos-injured claimants sent a letter to Keasbey's litigation counsel asserting that the remaining claims against Keasbey were "non-products" or "operations" hazard claims that were not subject to the products hazard aggregate limits. The letter stated in relevant part:

> "it is highly likely that the products/completed operations aggregate limits do not apply to these so-called 'non-products' claims. As a result, the actual value of Keasbey's insurance asset appears to be vastly greater than is reflected . . . The claimants therefore wish to ensure . . . that Keasbey and the carriers do not . . . otherwise extinguish the insurers' obligations that, in many cases *could be perpetual.*" (Emphasis added.)

The letter did not identify any particular claimant, lawsuit or insurer.

CNA did not issue a disclaimer of coverage in response to the May 15, 2001 letter; instead, it commenced this declaratory judgment action in October 2001 against Keasbey and added as of right the defendant class of asbestos claimants against Keasbey. CNA asked the court to declare that it owed no duty to indemnify Keasbey for any of the pending asbestos-related bodily injury claims because *all* of the remaining claims were within the definition of products hazard/completed operations coverage in the primary level policies that CNA had issued to Keasbey, that the limits of the subject policies had been exhausted, and that CNA had other defenses to further obligations under the policies.

Following a transfer of venue from Westchester County to New York County, the case was certified as a class action against the defendant class in January 2004. After extensive discovery and motion practice, a nonjury trial began on July 13, 2005, and ended on October 28, 2005. Keasbey, which had already ceased operations, defaulted in the action.

---

2. While CNA asks this Court for a declaration that four of its excess policies which paid out a total of $50 million in indemnity and defense costs exhausted their products aggregates, the exhaustion of these is not contested in this appeal. The issue of exhaustion of aggregate limits remains—and is determined below—with respect to only one of CNA's excess policies, RDU 8047261, which had aggregate limits of $1,000,000.

The trial court concluded, inter alia, that CNA had failed to carry its burden in showing that pending asbestos claims fall within the "products aggregates" of the subject insurance policies for products hazard and completed operations coverage. Moreover, it determined that the claimants were entitled to coverage under the "operations" provision.

Second, the court decided that the defunct Keasbey was guilty of laches but that the claimants were not subject to the affirmative defenses that CNA may have had against Keasbey. The court observed that such defenses as timely notice of claim, laches, ratification, estoppel and judicial estoppel were based on Keasbey's conduct, and that any right of the members of the defendant class to sue CNA was not derived from Keasbey directly, but was derived from Insurance Law § 3420 (a) (2). Thus, the court determined that the only defenses the insurer had against the injured claimants were those that "grow out of" the terms of the policy. (16 Misc 3d 223, 237 [2007].) The court also determined that CNA would nonetheless be precluded from asserting affirmative defenses, as it failed to timely disclaim coverage as to the class defendants.

Third, the court determined that coverage for asbestos-related injuries is triggered by exposure through inhalation and that each separate class member's exposure to conditions resulting in bodily injury constituted a separate occurrence under the subject insurance policy.

Further, the court held that CNA could not rely on the "expected or intended" exclusion, nor on the pollutant exclusion under the primary policies; and that the aggregate limit of plaintiff's excess policy RDU 8047261 was not exhausted. Finally, the court determined that OneBeacon's defense obligations extended only to claims arising out of exposure to a Keasbey asbestos-containing product at Indian Point Nuclear Power Plant Units 2 and 3.

On appeal, CNA asserts that the trial court erred in virtually every determination except the finding that Keasbey was guilty of laches. CNA argues that the "operations" provision is not applicable to the suits of the claimants because there is no evidence whatsoever that bodily injury in the plain meaning of the phrase was sustained while installation operations were ongoing or that it was incurred before the completion of any of the projects.

CNA also asserts that since Keasbey has defaulted, the claimants stand in the shoes of Keasbey, and thus the equitable

affirmative defenses like laches, waiver and equitable estoppel may be used against them; that exposure/inhalation is not the trigger according to applicable policy provisions; and that the trial court was wrong about allocating the burden of proof to CNA. Additionally CNA asserts that its excess policies should be declared exhausted.

Defendant OneBeacon America Insurance Company cross-appeals from that part of the order declaring that CNA's claims for reimbursement and contribution against OneBeacon were not barred by CNA's failure to provide timely notice of the claims for which reimbursement and contribution were sought. Defendant Employers Insurance Company of Wausau also cross-appeals from the court's findings of fact and conclusions of law with respect to the obligations of CNA and OneBeacon under their policies.

At the outset, we find that a disclaimer of coverage is not necessary in order for CNA to preserve its defenses under the policy. (*See Generali-U.S. Branch v Rothschild*, 295 AD2d 236, 237-238 [1st Dept 2002] [commencement of a declaratory judgment action can constitute disclaimer]; *see also Travelers Ins. Co. v Volmar Constr. Co.*, 300 AD2d 40, 45 [1st Dept 2002] [insurer has duty to disclaim only after it receives demand for defense and indemnification].)

Further, for the reasons set forth below, this Court finds that the trial court erred in denying CNA the declaration it sought. As a threshold matter, it is well established that CNA has the burden of proving that it is entitled to the declarations it seeks. (*Mount Vernon Fire Ins. Co. v NIBA Constr.*, 195 AD2d 425, 427 [1st Dept 1993, Sullivan J., concurring].) For CNA to obtain a declaratory judgment as to its obligation to indemnify in advance of trial, it must demonstrate as a matter of law that "there is no possible factual or legal basis on which the insurer may eventually be held liable under its policy." (*First State Ins. Co. v J & S United Amusement Corp.*, 67 NY2d 1044, 1046 [1986].)

Notwithstanding the foregoing, the equally well established principle is that an insured must prove entitlement to the coverage sought while an insurer must prove an exclusion in the policy to defeat coverage. (*Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208, 218 [2002].) Since Keasbey, the insured, defaulted and claimants stand in its shoes, claimants bear the same burden of proof. (*D'Arata v New York Cent. Mut. Fire Ins. Co.*, 76 NY2d 659, 665 [1990].)

■ In this case, CNA demonstrated that there exists no possible basis, factual or legal, for liability outside of the products hazard/completed operations provisions. In any event, claimants did not produce any evidence whatsoever in support of the new theory of liability; namely, that injuries arose before contracting operations by Keasbey were completed.

In the most egregious part of its determination, the trial court agreed that Keasbey was guilty of laches but that none of the equitable defenses of laches, waiver, ratification or estoppel were available to CNA against the claimants. The court found that Keasbey had never brought a declaratory judgment action asserting that there should be "operations" coverage for asbestos claims against it. It further found that CNA, as Keasbey's insurer, would be prejudiced in defending any such "operations" claims because numerous material witnesses had died, and relevant documents are no longer available.

Indisputably, Keasbey was guilty of laches. The court found, however, that the claimants were in a different position. In so ruling, the trial court misconstrued Insurance Law § 3420, which deals with the rights of an injured plaintiff to proceed directly against an insurer after obtaining judgment against an insured. (*See Lang v Hanover Ins. Co.*, 3 NY3d 350, 354-355 [2004], citing *Coleman v New Amsterdam Cas. Co.*, 247 NY 271, 275 [1928, Cardozo, Ch. J.] [under New York's direct action statute, Insurance Law § 3420, the rights of an injured claimant against the insurer are no less and *no greater* than those of the insured].) This plainly means that all the defenses available to an insurer against an insured are available also against injured claimants.

In its departure from New York law, the trial court appeared to rely on *Rucaj v Progressive Ins. Co.* (19 AD3d 270 [1st Dept 2005]), in which this Court held that an insurer's defenses in a section 3420 action against a claimant are those it would have against the insured. Then, without the support of any legal authority, the court stated: "That should not be held to mean that all of the insurer's defenses against the insured are available against an injured claimant." (16 Misc 3d at 237.) Instead of relying on case law that was precisely on point, the trial court relied on two cases that had nothing to do with rights derived from Insurance Law § 3420.

The principle that neither party in a section 3420 action has any rights greater or lesser than if the action were between insurer and insured has been consistently applied by the Court

of Appeals and intermediate appellate courts, which have found that those rights include the equitable affirmative defenses available against a policyholder. (*See D'Arata*, 76 NY2d at 665). In *D'Arata*, the plaintiff, a victim of an assault, brought an action under section 3420, seeking to compel the insurer to pay a judgment on behalf of the insured defendant up to the limit of the policy. The insurer used collateral estoppel as an affirmative defense asserting that the plaintiff was estopped from relitigating the issue of insured's intent to inflict bodily injury. (*Id.* at 662 [analysis related to whether a finding in a criminal proceeding could be used to satisfy the expected or intended exclusion of the policy].)

In considering whether the defense barred the claim, the Court of Appeals first observed that the affirmative defense of collateral estoppel is an "equitable doctrine . . . grounded on concepts of fairness and should not be rigidly or mechanically applied." (*Id.* at 664.) The Court further held that the plaintiff was subject to the same affirmative defenses that would apply against the insured, and explained: "Plaintiff, by proceeding directly against [insurer], does so as subrogee of the insured's rights and is subject to whatever rules of estoppel would apply to the insured." (*Id.* at 665; *see also Zimmerman v Tower Ins. Co. of N.Y.*, 13 AD3d 137, 138-139 [1st Dept 2004] [plaintiff subrogee of insured's rights is subject to whatever rules of estoppel that would apply to insured]; *Van Gordon v Otsego Mut. Fire Ins. Co.*, 232 AD2d 405 [2d Dept 1996] [noncooperation of insured party is ground upon which insurer was denying coverage and may be asserted by insurer as defense in action on a judgment by injured plaintiff pursuant to Insurance Law § 3420 (a)].)

Thus, the issue is not whether *claimants* engaged in delay and are guilty of laches. The issue properly framed is whether claimants can obtain coverage under a newly asserted theory of liability when the insured engaged in acts or omissions that would preclude that coverage had the insured brought this claim. The answer must be, as precedent demands, that equitable affirmative defenses are available to CNA against the claimants who stand in Keasbey's shoes, and that if laches is available against Keasbey, it may be used against the claimants.

Laches is an equitable doctrine based on fairness. Courts have invoked the doctrine to prevent stale claims and the prejudice that can result. Whether the doctrine is applicable, however, depends on the facts of the case. (*See Orange & Rockland Utils.*

*v Philwold Estates,* 70 AD2d 338, 343 [3d Dept 1979], *mod* 52 NY2d 253 [1981].)

In this case, the inequity would be particularly egregious. As the amicus curiae brief asserts in behalf of Keasbey's insurers, CNA would be in a position to owe "perpetual and virtually unlimited obligations to provide coverage for a never-ending torrent of asbestos claims" under a theory of coverage "never before asserted by Keasbey," and yet it would be "hampered in [its] ability to defend . . . because of the loss of evidence." Here, counsel for claimants raised the possibility of "perpetual coverage" under a new theory of liability in May 2001 as the products aggregates were being exhausted. As a result of negotiated settlements, eventually more than $110,000,000 was paid out over 10 years, largely to the clients of the law firm of Weitz & Luxenberg. Of that, CNA paid out $8.7 million on its primary policies and more than $50,000,000 as an excess insurer.

Moreover, testimony at the bench trial in this case adduced the following: that until 2001, Keasbey was sued as a manufacturer, distributor and seller for strict products liability and failure to warn. Keasbey argued in each case that it was an installer (which should have triggered "operations" coverage for alleged negligent installation), but Keasbey always lost that argument. Claimants, or rather counsel for claimants, apparently did not want to be involved in cases where they would have to prove that bodily injury was tied to a specific accident or occurrence of negligent installation in a specific period of time when the installer had used a specific manufacturer's asbestos product.

Indeed, the simplest route to recovering damages for asbestos-related claims after 1973 was to assert products liability against the manufacturer, distributor or seller based on asbestos being "unreasonably dangerous." (*See Borel v Fibreboard Paper Prods. Corp.,* 493 F2d 1076 [5th Cir 1973], *cert denied* 419 US 869 [1974].) Under *Borel,* which was followed in New York, claimants were obligated to prove only that (1) they had been exposed to defendant's product and (2) show an asbestos-related disease. Additional relief for claimants appeared in 1986 when a legislative amendment to the statute of limitations meant that the clock started running upon "discovery" of disease rather than actual injury.

The foregoing events led to the biggest mass tort litigation of our time with courts in New York creating asbestos dockets where cases, sometimes hundreds at a time, were consolidated and special asbestos rules allowed standard complaints and

discovery requests to be used in cases where, as CNA asserts, facts were tried for a few and then special verdicts were applied to all. Cases against Keasbey were brought mainly in New York by a handful of law firms, the most prolific of which were Weitz & Luxenberg, and Wilentz Goldman.

Testimony further adduced that a typical claimant filed a standard asbestos complaint generally against a list of defendants which typically read: "During the course of [plaintiff's] employment, plaintiff was exposed to the defendants' asbestos and asbestos containing materials to which exposure directly and proximately caused him to develop an asbestos related disease." All claimants alleged that Keasbey was a manufacturer and seller who "should have known" about the health hazards of products and warned others of those hazards.

The record reflects that in the State Powerhouse consolidation trial of 1992, two claimants obtained multi-million-dollar damages verdicts after claimants' counsel opened the proceedings by pointing to Keasbey's role as a manufacturer with a " 'resultant obligation' to understand . . . its resultant potential liability for a failure to warn." Counsel closed by calling Keasbey a "murderer." After 1992 and until 2003, only a few Keasbey cases began trial and all settled before verdict.

As to settlement negotiations, testimony at trial further adduced the following: In late 1991, court-supervised settlement negotiations began in the State Powerhouse Cases combined with Federal Powerhouse Cases. In cases from both jurisdictions, hundreds of claimants, dozens of defendants and insurers for each defendant participated in negotiations. CNA was part of the discussions as Keasbey's primary insurance carrier; subsequently Hartford, Keasbey's excess carrier, joined the discussions, as did excess carriers INA and Fireman's Fund, a second-level insurer.

As CNA asserts, it was understood that excess carriers would pay for Keasbey's asbestos cases only if prior products hazard cases had exhausted the aggregate limits in the primary policies and if the pending cases were all products hazard cases. Since insurers at the time were aware that a "non-products" argument could avoid aggregation, Hartford, INA and Fireman's Fund scrutinized the evidence on these issues to satisfy themselves that the claims indeed fit within the products hazard coverage and thus were subject to aggregate limits.

Indeed, trial exhibits established that Keasbey's counsel discussed coverage issues including whether to file a declaratory

judgment coverage action arguing for coverage beyond aggregate limits such as would be available in claims pursuant to "operations" coverage. As determined by the trial court, Keasbey never filed such an action, and in fact testimony at trial established that until 2001, when CNA was paying the last of its excess coverage, nobody questioned that Keasbey asbestos claims were products claims subject to products aggregate limits. By the time aggregate limits were reached, claimants had received more than $110,000,000 in satisfaction of their claims.

Ultimately, the prejudice in defending against a new theory of liability (see discussion below) that is particularly dependent on establishing facts for each individual claimant is obvious when witnesses have either died or are suffering from faded memories, and relevant documents have been lost. Given the foregoing, it is patently false for claimants to argue that CNA knew that asbestos claims against Keasbey are likely to be "operations" claims. On the contrary, prior to CNA reaching the aggregate limit of its coverage in 2001, all claims were products claims. Thus, CNA had no reason to preserve evidence or perpetuate testimony (even had it been able to depose claimants), or seek declaratory relief regarding any particular insured.

The well-established rationale for the doctrine of laches is to prevent a party from injustice that would arise from the assertion of stale claims. (*See Marcus v Village of Mamaroneck*, 283 NY 325, 332 [1940] [defense of laches is based upon the principle that plaintiffs have delayed to the prejudice of defendants].) Thus, the trial court correctly found that laches is applicable in this case.

However, contrary to the court's findings, there is nothing at all inequitable in applying the doctrine to the claimants. Even if the Insurance Law did not require such application to the subrogee claimants, in this case it is fittingly applied to them. It is worth noting that as late as 2003, a Keasbey trial brought by claimant Michael O'Reilly opened and closed in a fashion consistent with all prior cases. Keasbey was sued as manufacturer, seller or distributor on theories of strict products liability and failure to warn. In this case, the same Michael O'Reilly stands as the class representative, typical of all class members, who apparently would sue Keasbey for sustaining bodily injury during Keasbey's *negligent* installation of asbestos under a nonproducts theory simply because the theory provides a new set of deep pockets. In another case, where a claimant is now also a member of defendant class, counsel defeated a summary judg-

ment motion filed by Keasbey by arguing that Keasbey was a manufacturer and seller of asbestos-containing products. No evidence was presented that Keasbey was negligent in installation. The summary judgment motion was argued in October 2003, more than two years after counsel had raised the issue of non-products claims against Keasbey.

We find therefore that laches in this case is a valid affirmative defense against the claimants who stand in defendant Keasbey's shoes, and it bars the claim of the defendant class. Thus, there exists no legal basis on which the insurer may eventually be held liable for operations coverage under its policy.

■ Furthermore, the trial court erred in holding that a factual basis exists for CNA's liability under the non-products/operations provisions because it incorrectly relied on the holding in *Frontier Insulation Contrs. v Merchants Mut. Ins. Co.* (91 NY2d 169 [1997]). The court erred in its extrapolation from that case that exposure by inhalation constitutes an injury that triggers coverage. The instant case is simply not controlled by *Frontier*.

*Frontier* involves only the very narrow issue of an insurer's duty to defend where allegations before the court included those of negligent installation. In fact, the Court started its opinion with the words: "The narrow issue before us . . . is whether the 'products hazards' exclusions in the insurance policies at issue relieve defendant insurers of the duty [to] defend their insured, an asbestos insulation contractor." (*Id.* at 173-174.)

The insurer in *Frontier* sought a ruling that all of the claims against its policyholder should be considered products hazard claims since injuries arose out of the inherently dangerous nature of the product. Frontier however, was not a manufacturer or seller like Keasbey, but only an installer of insulation products. The tort claims arising against it were not based on a manufacturer's or seller's duty to warn or based on what a seller or manufacturer should know about a product it puts into the stream of commerce, but were based on a theory of *negligent* installation. The Court of Appeals ruled against the insurer, as it found that products liability coverage "cannot apply to *accidents or occurrences* that allegedly took place while Frontier's installation work was in progress because the offending product—the asbestos insulation—was not relinquished from Frontier's control until installation was complete." (*Id.* at 177 [emphasis added].)

Rather, the Court observed that at least some of the suits "expressly allege" that negligent installation of asbestos caused their personal injuries. (*Id.*) The Court then added that

"Since asbestos fibers may be readily released into the air and inhaled while a contractor is cutting and sawing the product during installation, there is a reasonable possibility that any liability attributed to Frontier would stem from injuries that occurred during ongoing operations—covered events." (*Id.* at 177-178.)

Much has been made of this foregoing observation in the trial court's decision and by the claimants on appeal. Mistakenly so, since it should not be considered as anything more than dicta.

First, the issue before the *Frontier* Court was the duty to defend, which is a much broader duty than the duty to indemnify. (*Atlantic Mut. Ins. Co. v Terk Tech. Corp.*, 309 AD2d 22, 28 [1st Dept 2003] [the duty to indemnify does not turn on the pleadings but rather on whether the loss as established by the facts is covered by the policy].) The duty to defend is decided solely on the allegations in the complaint which must be accepted by a court as true, and which here included allegations of personal injuries arising out of negligent installation.

Further, the declaration sought in *Frontier* was that all the claims fell within the products hazard *exclusion*, and there was no distinction made as to whether the injuries happened before or after operations were completed. More significantly, the insurers did not present any evidence as to the scope or timing of the injury, and so there was no such analysis by the *Frontier* Court. In other words, there was no evidence, as there is in the instant case, as to what constitutes injury in an asbestos claim, and whether that injury can in fact occur while operations are ongoing and before they are completed. Ultimately, the *Frontier* Court was constrained to rule against the insurer because it found there was a "reasonable possibility" of liability.

To the extent that there was no evidence before the *Frontier* Court, and therefore no analysis, on the issue of "injury," we decline to follow the suggestion that injury happens on inhalation, as it is obiter dictum. The trial court, therefore, incorrectly interpreted the *Frontier* decision to stand for the proposition that injury in asbestos-related claims occurs upon exposure by inhalation of fibers.

To reach that point in this case, the trial court made the distinction between three different theories of liability: (1)

products hazard coverage for insurable risks due to a defective product that has been put into the stream of commerce; (2) completed operations coverage, which covers risks of loss for injuries that arise out of operations of the insured that have been completed and occur away from the premises of the insured; and (3) premises/operations coverage, which covers risks that arise due to injuries from the defective product while the work with the product is still in progress. (16 Misc 3d at 230-231.) "If relinquishment has not occurred, and the operations have not been completed, then operations coverage applies." (*Id.* at 231.)

The court then held that CNA had not demonstrated that the injuries of claimants occurred after relinquishment of the asbestos products or after operations were completed. The court observed that: "When defendant Keasbey cut, sawed, mixed, and removed asbestos-containing materials as part of its insulation operations at various job sites, other individuals at those sites were exposed to asbestos dust." (*Id.* at 229.) Without pointing to any other evidentiary material, the court then concluded: *"the evidence has shown that the injuries happened while the installation operations of defendant Keasbey were ongoing."* (*Id.* at 231 [emphasis added].)

In its discussion as to when coverage is triggered for malignant and nonmalignant asbestos-related injuries, the court stated that "[c]overage is triggered under the subject insurance policies when a bodily injury occurs." (*Id.* at 241.) In the next paragraph however, citing *Appalachian Ins. Co. v General Elec. Co.* (19 AD3d 198 [1st Dept 2005], *affd* 8 NY3d 162 [2007]) and *Matter of Midland Ins. Co.* (269 AD2d 50 [1st Dept 2000]), the court held that "it is an occurrence that triggers coverage, and an occurrence is the exposure to asbestos by inhaling it . . . not an injury therefrom." (*Id.*) Therefore coverage for both types of injuries is "triggered by exposure to asbestos during the policy periods." (*Id.*)

Finally, in addition to these conflicting determinations, the trial court observed: "[t]he risks of injuries during operations grow[ ] out of the use of the asbestos products during the operations." (*Id.* at 231.)

Setting aside the fact that the timing of the *risks* of injuries is irrelevant, the court, in relying on *Matter of Midland Ins. Co.* and *Frontier* (that occurrence not injury triggers coverage), ignored the applicable policy provisions relevant to this case; and in holding that "injuries happened" during installation

operations, disregarded New York law. The court all but ignored the testimony of medical experts that went largely uncontroverted at trial.

As a starting point for any analysis as to what triggers coverage, the Court must look at the applicable policy provisions. As noted, in this case, the policies at issue are 17 primary level CGL policies. The policies between 1970 and 1987 cover bodily injury and property damage which occur during the policy period. Three pre-1973 policies under the CGL provisions state that CNA is obligated to pay "all sums" for an occurrence, defined as an "accident including continuous or repeated exposure to conditions which results *during the policy period in bodily injury*." (Emphasis added.)

In the 1973-1987 primary policies, "bodily injury" is defined as "bodily injury, sickness or disease sustained by a person which occurs during the policy period." "Occurrence" is defined as "an accident including continuous or repeated exposure to conditions which results in bodily injury . . . neither expected nor intended from the standpoint of the insured."

Quite clearly then, under the 17 subject policies, it is "bodily injury" that triggers coverage, and an insured in order to recover under the policy must show that an injury occurred during the policy period and that it occurred as a result of an accident or injurious exposure. Further, to recover under the "operations" provisions, an insured must show that the injury occurred before any such contracting operations were completed.

Testimony at trial indicated that a typical instruction for claims handlers looking at claims falling within "operations" coverage stated: "This type of loss relates to injuries that allege injury to the claimant resulting from exposure while the insured is using a substance or causes a substance to be released." The example given in the instructions was of an employee of the insured—as for example a Keasbey installer would be—repairing a chemical tank on the premises of corporation "A." During repair the insured ruptures the tank causing an employee of corporation "A" to suffer chemical burns.

This simple example of a visible injury sustained contemporaneously with the negligent act or occurrence, however, is not particularly useful to any analysis of asbestos-related claims. The undisputed fact that both malignant and nonmalignant asbestos-related diseases require periods of long, intensive exposure rather than a single period of inhalation coupled with the fact that the full-blown version of both types of disease

develops only after a long latency period almost always prompts the question of what constitutes injury in an asbestos-related claim. Moreover, in an "operations coverage" case, establishing the when and the how of the injury is especially crucial since injury must be shown to arise before the completion of an operation.

The question of what constitutes injury in asbestos-related claims has vexed state and federal courts across the nation since the 1980s. (*See Insurance Co. of N. Am. v Forty-Eight Insulations, Inc.*, 633 F2d 1212, 1222 [6th Cir 1980], *cert denied* 454 US 1109 [1981] ["cumulative, progressive disease does not fit the disease or accident situation which the policies typically cover"].) The Sixth Circuit majority explained the dilemma as follows: "There is usually little dispute as to when an injury occurs when dealing with a common disease or accident. . . [In the case of asbestosis] there is considerable dispute as to when an injury . . . should be deemed to occur." (*Id.* at 1222.) Hence the pertinent question is: what constitutes sufficient bodily injury to trigger coverage. (*See Continental Cas. Co. v Rapid-American Corp.*, 80 NY2d 640, 650 [1993].)

Testimony by CNA's medical experts as to how malignant and nonmalignant types of asbestos-related diseases develop was largely uncontroverted. It established that adverse health effects from asbestos are "due to the inhalation of fibers in concentrations sufficient to overwhelm the normal pulmonary defense and clearance mechanisms." Researchers, acknowledged to be authoritative by the claimants' expert, testified that "most workers with asbestos exposure, as well as members of the general population who inhale asbestos fibers from ambient air, show no evidence of [subclinical] fibrosis."

Medical experts for both sides at trial agreed that there is a threshold fiber dose below which asbestosis is not seen, although the claimants' expert did not offer an opinion as to when it was reached. CNA, however, introduced testimony based on leading studies that showed the following statistics: that asbestosis is usually observed in individuals who have had many years of high-level exposure, typically asbestos miners and millers, asbestos textile workers and asbestos insulators like Keasbey employees (who are not members of the class in the instant case because workers' compensation laws prevent them from suing Keasbey). The Selikoff studies showed that for asbestos insulators asbestosis occurs in 92% of those with more than 40 years' exposure but in only 10% of those with 10 to 19 years of exposure.

Typical "bystanders" on the other hand, who comprise the majority of the claimants, here have normal lungs 71% of the time if they had less than 30 years of exposure. Based partly on these studies, one of CNA's medical experts opined that the threshold is typically not reached for "bystanders" for at least "several years"—which CNA asserts is longer than any Keasbey contracting job took to complete.

Dr. Edward Philip Cohen, for CNA, testified as follows as to the development of asbestos-related diseases:

> "Each inhalation of asbestos fibers results in alterations that contribute in a significant manner to the cumulative disease process. I would not use the word injury . . . but certainly the presence of asbestos fibers indirectly results in damage to cells and alterations of cellular material that *over a period of 20-40 years* can result in the development of impairment." (Emphasis supplied.)

Testifying about the point where cell mutation becomes irreversible in malignant asbestos-related diseases like mesothelioma, Dr. Cohen stated:

> "to say that cancers develop well before clinical manifestations is true but not for mesothelioma . . . once the last mutation occurs the cells take off and grow very, very rapidly and the evidence from that is the time of death from the time symptoms first appear."

As for what causes mesothelioma, he testified:

> "mesothelioma is common in individuals who have been exposed to asbestos however . . . many individuals with mesothelioma have no such exposure history . . . and even in individuals who have [it] and have an exposure history does not necessarily prove that mesothelioma was a consequence of the earlier exposure to asbestos and the only way to prove [that] is to examine the mesothelioma and look for presence of asbestos bodies."

As for lung cancer, Dr. Cohen testified that studies have shown "a synergistic increase in the risk of lung cancer is present in individuals who both smoked and were exposed to asbestos."

Hence, testimony and evidence established that it can take 20 to 40 years after exposure for actual impairment of bodily functions to develop, that it is a progressive, cumulative disease that

starts with alterations of tissue cells and subclinical tissue damage and could progress, though not necessarily would progress, into full-blown asbestosis, mesothelioma or lung cancer.

Further, medical evidence submitted in this case established that while those with asbestos-related diseases can usually track the illness back to asbestos exposure of some type, it is not axiomatic that exposure results in asbestos-related injury, sickness or disease. The conclusion to be drawn therefore is that factors other than mere initial or one-time exposure to asbestos fibers are implicated in the development or progression towards asbestos-related injury, sickness or disease. Whether these factors are related to the length of exposure or intensity of exposure, or whether there are catalysts like smoking or genetic predisposition involved is not established. However, one indisputable fact to emerge from medical evidence in the plethora of asbestos cases litigated in many different jurisdictions is that actual injury generally develops over time depending on a range of circumstances and conditions, but does not occur upon exposure by inhalation.

As one judge of the Sixth Circuit eloquently stated in his dissent in *Insurance Co. of N. Am. v Forty-Eight Insulations, Inc.*:

> "Th[e] [exposure] rule is not satisfactory because some asbestos may be safely inhaled without the disease ever developing. With more exposure, some harm may later develop but remain latent for a significant number of years. Insurance law does not impose liability or coverage until some identifiable harm arises. An indemnifiable act does not occur at the time of the negligent act, but at the time the legally recognizable harm appears . . .

> "At the time of initial exposure, a victim could not successfully bring an action against the manufacturer because at that time he has suffered no compensable harm." (633 F2d at 1229 [Merritt, J., dissenting].)

There are jurisdictions like the Sixth Circuit that subscribe to the exposure theory holding that even minimal tissue damage is injury. It is the theory that the trial court appears to favor. But that is not the law in New York. The Court of Appeals declined to subscribe to an exposure theory in *Continental Cas. Co. v Rapid-American Corp.* (80 NY2d 640 [1993]), and instead appeared to approve of injury-in-fact as a trigger for coverage. It explained:

"Decisions on when coverage is triggered for asbestos-related injury generally may be divided into four categories: (1) on exposure to asbestos; (2) on manifestation of disease; (3) on onset of disease, whether discovered or not ('injury-in-fact'); and (4) all of the above—in other words, a 'continuous trigger.' Federal courts have concluded that the 'injury-in-fact' rule is most consistent with New York law." (*Id.* at 650-651 [citations omitted].)

Indeed, an injury-in-fact test rests on when the injury, sickness, disease or disability actually began and, of the four categories, comports most closely with general principles of tort and insurance law. In *American Home Prods. Corp. v Liberty Mut. Ins. Co.* (565 F Supp 1485 [SD NY 1983], *affd in part, mod in part* 748 F2d 760 [2d Cir 1984]), the court stated:

"although exposure to asbestos does not usually injure seriously enough to constitute an 'occurrence' in the context of a liability insurance policy, a finder of fact might, nevertheless, find that a particular exposure or period of exposure contemporaneously caused a compensable injury." (565 F Supp at 1498.)

"[A] real but undiscovered injury, *proved in retrospect to have existed at the relevant time*, would establish coverage, irrespective of the time the injury became manifest." (*Id.* at 1497.)

But the court stated unequivocally that "injury-in-fact" requires the insured to demonstrate actual damage or injury during the policy period. (*Id.* at 1497.)

Claimants in the instant case offered no evidence whatsoever that any of them sustained an injury-in-fact in any one of the policy periods arising out of "ongoing operations." Not surprisingly, since the burden on claimants to prove so would be insurmountable given not only the absence of evidentiary material, but the difficulty if not impossibility of pinpointing when any subclinical tissue damage tipped over into actual impairment. In *Matter of Midland Ins. Co.*, this Court determined that "[t]here exist at present no medical techniques capable of specifically identifying and quantifying the progression of asbestos-related injury, sickness or disease actually sustained in each year from and after a first exposure to asbestos fiber." (269 AD2d at 58.)

The Fifth Circuit echoed that view, observing:

"[t]he challenge in adopting the injury-in-fact ap-

proach is that, in each case . . . a mini-trial must be held to determine at what point the build-up of asbestos in the plaintiff's lungs resulted in the body's defenses being overwhelmed. At that point, asbestosis could truly be said to occur." (*Guaranty Natl. Ins. Co. v Azrock Indus. Inc.*, 211 F3d 239, 246 [5th Cir 2000] [internal quotation marks and citation omitted].)

Thus, each claimant in the instant case would have to produce medical evidence that the point where asbestos fibers overwhelmed the body's defenses happened in one of the 17 years of the subject insurance policies. Further, and crucial to recovery under non-products/operations coverage, they would have to establish that the injury was sustained before a contracting operation was completed. This means that a claimant would have to show one of two sets of conditions occurred: (1) contemporaneous injury, that is, injury-in-fact stemming from an ongoing operation in the same policy year, but the probability of such a situation appears highly unlikely given the absence of evidence that any Keasbey installation project lasted long enough for the sort of lengthy intensive exposure required for asbestosis to develop in the same year; or, possibly (2) injury-in-fact arising in the policy year but as a result of exposure during an ongoing operation years, maybe decades, prior. In the latter case, a claimant would have to show that he was exposed only during that ongoing operation and that he was never exposed to asbestos after a Keasbey installation project was completed. In other words, setting aside the lack of documentary evidence or witness testimony to establish such, the claimant would be obligated to prove a negative, that is, he was never exposed to asbestos after Keasbey completed its installation operations.

This would be impossible for claimants who typically were "bystanders," that is tradesmen and utility workers who worked alongside Keasbey installers during installation projects and then continued working in the plant after operations were completed, and were thus exposed to the installed asbestos.

Indeed, no such evidence was presented at trial for any group of claimants, never mind the class. Claimants rely on the assertion that CNA acknowledged in the prior "products hazards" claims that the claims arose out of plaintiffs' exposure to asbestos dust during contracting operations, in effect admitting that injuries were sustained during an ongoing operation.

They are mixing apples and oranges. CNA acknowledged that claimants were exposed during operations, and that at some

future point in time, sometimes decades later, claimants manifested asbestos-related disease. Recovery under products liability claims is not dependent, as it is here, on the timing of the actual injury nor the particular stage of installation projects at which actual injury may have taken place. The claimants are making an impermissible leap if they believe they can go forward and prove injury during ongoing operations simply by a conclusory assertion: claimant was exposed, claimant developed full blow-blown asbestos-related injury decades later, ergo, injury was sustained at the time of exposure.

In rejecting the contention that manifestation of asbestosis 40 years later is proof that injury occurred when the first asbestos dust was inhaled, it is perhaps worth considering the view of Judge Learned Hand in 1939 when he wrote on a health insurance case: "[A] disease is no disease until it manifests itself. Few adults are not diseased, if by that one means only that the seeds of future troubles are not already planted." (*Grain Handling Co. v Sweeney*, 102 F2d 464, 466 [2d Cir 1939], *cert denied sub nom. Grain Handling Co. v McManigal*, 308 US 570 [1939].)

In any event, injecting a conclusory assertion into what is essentially a products liability argument is not enough to establish a basis for coverage under ongoing operations provisions of the subject policies. The only conclusion that can be reached is that injury did occur sometime before manifestation and after exposure. However, in order for claimants to establish their entitlement to limitless liability and perpetual coverage they must show, under the relevant provisions of the subject policies, that the actual injury occurred in the policy period and that it arose solely out of an ongoing operation. The burden on a claimant to come forward with the necessary medical evidence or documentation or witnesses to support that his or her only exposure occurred during an ongoing project rises to the level of factual impossibility.

We find, therefore, that CNA has demonstrated that there is no factual or legal basis for liability other than under the products hazard/completed operations provisions of the policies, and so the declaration sought by plaintiffs that they have no duty to indemnify is warranted by the record.

Finally, we are persuaded that as to excess policy RDU 8047261, the aggregate limit of $1,000,000 is exhausted. More than a year after CNA filed its declaratory action in 2001, CNA settled six claims for $2,865,000. At the time of the settlements,

CNA did not know there was a 1971 excess policy with $1,000,000 in untapped products coverage. Consequently, it accounted for the settlement of the six claims by labeling them with an accounting code that indicated bodily injury claims rather than products cases. The defendant class asserts that CNA cannot now reclassify the claims and so have the excess policy declared exhausted. We disagree.

As CNA points out, the claims were settled on six trial-ready cases that CNA was not ready to defend. It argues that it used a catchall accounting code for bodily injury because no other code applied once aggregate limits appeared exhausted. But CNA rejects the contention that it made a deliberate coverage decision to classify the claims as operations claims. It settled the claims to avoid default judgment. Indeed, by bringing the declaratory judgment action in the prior year, we would agree that CNA reserved its right to apply the $2,865,000 against the later-discovered products policy, thus exhausting the aggregate limit of the policy.

In light of the foregoing, we find the remaining issues raised by plaintiffs on appeal and defendants OneBeacon and Wausau on cross appeal academic, and therefore decline to rule on them.

Accordingly, the order of the Supreme Court, New York County (Richard F. Braun, J.) entered on or about June 11, 2007, insofar as it declared that the asbestos claims against insured Keasbey are not within the products liability coverage, and thus not subject to the policies' aggregate limits; that the defendant class is not subject to the affirmative defenses that plaintiffs may have had against Keasbey; that coverage for the defendant class is triggered by exposure and that each individual class member's exposure to conditions resulting in bodily injury constituted a separate occurrence; and that the aggregate limit of CNA's policy RDU 8047261 was not exhausted, should be reversed, on the law, with costs, and it is declared that (1) claims arising out of Keasbey's asbestos insulating activities are included within the products hazard/completed operations coverage, (2) defendant class is subject to the affirmative defenses that CNA may have had against Keasbey, (3) coverage for defendant class is not triggered by exposure, but by injury-in-fact and each individual class member's exposure to conditions resulting in bodily injury does not constitute a separate occurrence, and (4) the aggregate limit of CNA's excess policy RDU 8047261 is exhausted.

Motion seeking leave to file amicus brief granted.

Tom, J.P., FRIEDMAN and NARDELLI, JJ., concur.

Order, Supreme Court, New York County, entered on or about June 11, 2007, reversed, on the law, with costs, and it is declared that (1) claims arising out of Keasbey's asbestos insulating activities are included within the products hazard/completed operations coverage, (2) defendant class is subject to the affirmative defenses that CNA may have had against Keasbey, (3) coverage for defendant class is not triggered by exposure, but by injury-in-fact and each individual class member's exposure to conditions resulting in bodily injury does not constitute a separate occurrence, and (4) the aggregate limit of CNA's excess policy RDU 8047261 is exhausted. Motion seeking leave to file amicus brief granted.